# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**
**No. 18-617V**
Filed: May 19, 2026

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

JEANNE RUDZKI,  \*
  \*
  Petitioner,  \*
  \*
 v.  \*
  \*
SECRETARY OF HEALTH  \*
AND HUMAN SERVICES,  \*
  \*
  Respondent.  \*
  \*

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

*Bridget McCullough, Esq.,* Muller Brazil, LLP, Dresher, PA, for petitioner.
*Mallori Openchowski*, U.S. Department of Justice, Washington, DC, for respondent.

## DECISION[1]

**Roth**, Special Master:

On May 1, 2018, Jeanne Rudzki ("Ms. Rudzki" or "petitioner") timely filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. § 300aa-10, *et seq.*[2] ("Vaccine Act" or "Program"). Petitioner alleges that she suffered "chronic encephalitis resulting from the [Tdap] vaccination, a 'Table' injury, which is contained on the Vaccine Injury Table, 42 C.F.R. 100.3 (a) II (B) 2017, received on December 5, 2015. Petitioner's symptoms began within seventy-two (72) hours of vaccination and lasted for more than six (6) months."[3] Petition at 1, ECF No. 1.

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). This means the Decision will be available to anyone with access to the internet. In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755 (1986). Hereinafter, for ease of citation, all "§" references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

[3] The terms "encephalitis" and "encephalopathy" are used interchangeably throughout this Decision because petitioner's providers used both terms. Encephalopathy is defined as any degenerative disease of the brain, while encephalitis is defined as inflammation of the brain. Encephalopathy, DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 608 (33rd ed. 2020) [hereinafter *Dorland's*]; Encephalitis, *Dorland's* at 605.

For the detailed reasons set forth below, I find that petitioner has not demonstrated by preponderant evidence that the Tdap vaccination she received on December 5, 2015 caused encephalitis or played any role in her seizures later diagnosed as epilepsy. Thus, she is not entitled to compensation.

## I.    Procedural History

The petition was filed on May 1, 2018, in addition to some of petitioner's medical records. Petitioner's Exhibits ("Pet. Ex.") 1-5, ECF No. 1. The case was assigned to the undersigned the following day. ECF No. 4.

Petitioner filed additional medical records on May 31, 2018 and a statement of completion on June 1, 2018. Pet. Ex. 6, ECF Nos. 7-8. Following several extensions, respondent filed a status report on February 5, 2019, identifying records that remained outstanding. ECF Nos. 9-12, 14.

Petitioner filed additional records on March 7, 2019 and April 2, 2019. Pet. Ex. 7-8, ECF Nos. 16-18. Respondent filed his Rule 4(c) Report on July 25, 2019, advising that this case was not appropriate for compensation. ECF No. 22.

Petitioner filed an expert report from Dr. Frederick Nahm on November 22, 2019. Pet. Ex. 9, ECF No. 25. Respondent filed a responsive expert report from Dr. Steven Evans on April 20, 2020. Respondent's Exhibit ("Resp. Ex.") A, ECF No. 30. Petitioner filed another report from Dr. Nahm on July 15, 2020, and respondent filed another report from Dr. Evans on September 24, 2020. Pet. Ex. 20, ECF No. 34; Resp. Ex. C, ECF No. 36.

A status conference was held on January 25, 2021. A detailed Order was issued thereafter memorializing the discussions, which included the content of petitioner's medical records, the expert reports filed by both parties, and several issues that needed to be addressed prior to entitlement, one being that petitioner's only claim was for "chronic encephalitis resulting from a [Tdap] vaccination, a 'Table' injury." Petition at 1. Notably, it was discussed that the concern raised for encephalitis in the medical record was ruled out by lumbar puncture and paraneoplastic antibody panel, both being normal. Therefore, there was no support for petitioner's Table claim of encephalitis. Further, the medical records included petitioner's reports of what appeared to be prior symptoms of seizure activity before her receipt of the subject Tdap vaccination. It was determined that a fact hearing would be necessary prior to proceeding to entitlement and was scheduled for December 9, 2021. ECF Nos. 38, 40.

At the time of the pre-hearing conference on December 3, 2021, I noted concern that the medical records as filed were incomplete. After further discussion, the fact hearing was adjourned, and a deadline was set for petitioner to file the outstanding records. ECF Nos. 43-44.

Medical records were filed on January 13, 2022, February 14, 2022, March 16, 2022, April 14, 2022, and May 16, 2022. Pet. Ex. 27-40, ECF Nos. 45-53. Petitioner also filed a letter from her treating neurologist, Dr. Tiffany Eady, on February 14, 2022. Pet. Ex. 32, ECF No. 47.

2

A status conference was held on June 9, 2022. An Order issued after the conference, detailing the recent records filed which showed that petitioner's complaints following her receipt of the Tdap vaccination were the same as her complaints prior to receiving the subject vaccination, including experiencing auras and absence episodes. Petitioner's claim that she suffered a Table encephalitis when encephalitis had been ruled out by objective testing was again questioned. Also discussed was the finding on MRI that petitioner had a congenital brain anomaly of cortical dysplasia known to cause epilepsy. ECF No. 55.

Petitioner filed additional records on July 10, 2022. Pet. Ex. 41-44, ECF Nos. 60, 65. Respondent then identified more records that appeared outstanding. ECF No. 68. Petitioner filed those records on December 5, 2022. Pet. Ex. 45-49, ECF No. 70.

Another status conference was held on February 2, 2023 to discuss the more recently filed medical records. Petitioner's history of absence episodes, sleep disturbances which included tossing in her bed and tearing the sheets, and the finding of cortical dysplasia on MRI were discussed. It was noted that "more than 24% of epilepsies are due to cortical dysplasia, and medical literature supports that those with cortical dysplasia develop epilepsy at some point in adulthood and when they do, it is generally after some trigger." Thus, this case was a significant aggravation claim, and petitioner needed an expert report to address adult onset of epilepsy in the context of cortical dysplasia and petitioner's clinical history. ECF No. 71 (citations omitted).

On April 25, 2023, petitioner filed an expert report from one of petitioner's treating physicians, Dr. Fawad Khan, along with medical literature. Pet. Ex. 50-65, ECF No. 73. Respondent filed a responsive report on July 26, 2023. Resp. Ex. D, ECF No. 75. Petitioner confirmed she would not be filing any further reports and requested a Rule 5 Conference. ECF Nos. 76-77.

A Rule 5 Conference was held on November 15, 2023. The expert reports were discussed, and settlement was encouraged with the filing of a Motion for Ruling on the Record if a settlement could not be reached since the record was well-developed. ECF No. 79.

On January 15, 2024, petitioner advised that she would prefer to proceed with a Ruling on the Record and would "not be using Dr. Nahm's opinion to support her motion." ECF No. 80. A briefing schedule was set.

Petitioner filed her Motion on April 19, 2024, maintaining that she was entitled to compensation "for encephalitis, a 'Table injury,' resulting from the [Tdap] vaccination she received on December 5, 2015." Motion, ECF No. 82. Respondent responded on August 2, 2024. Response, ECF No. 85. Petitioner did not file a reply.

This matter is now ripe for ruling.

## II.     Relevant Terminology

The following medical terms appear throughout this decision and the medical records.

**Seizure** is defined as the sudden attack or recurrence of a disease or the single episode of epilepsy. An **absence seizure** consists of a sudden momentary break in consciousness of thought or activity, sometimes accompanied by automatisms or clonic movements, especially of the eyelids. **Focal seizure**, also referred to as a **partial seizure**, is any seizure due to a lesion in a specific, known area of the cerebral cortex. *Dorland's* at 1660.

A **simple partial seizure** is associated with autonomic and/or psychic symptoms and sensory phenomena such as olfactory and auditory. Resp. Ex. A Tab 1 at 2.[4] **Complex partial seizure** is a partial seizure characterized by varying degrees of impairment of consciousness; the person affected performs non-purposeful, repetitive movements which they may not remember. They usually begin with motor arrest and are followed by post-ictal confusion and amnesia. *Id*.; *Dorland's* at 1660.

**Epilepsy** is characterized by paroxysmal transient disturbances of brain function that may manifest as loss of consciousness, abnormal motor phenomena, sensory disturbances, or perturbation of the autonomic nervous system. *Dorland's* at 626.

**Grand mal epilepsy** is a symptomatic form of epilepsy often preceded by an aura and characterized by loss of consciousness with generalized tonic-clonic seizures. *Dorland's* at 626.

**Temporal lobe epilepsies** are characterized by simple partial seizures, complex partial seizures, and secondarily generalized seizures, or a combination of all of these. Resp. Ex. A Tab 1 at 2.[5] Seizures in temporal lobe epilepsies generally occur in clusters at intervals or randomly. *Id*. EEG findings in temporal lobe epilepsies may show no abnormality; slight or marked asymmetry of background activity; or temporal spikes, sharp waves, and/or slow waves that are unilateral or bilateral, synchronous or asynchronous, and may not be always localized to the temporal region. *Id*.; *Dorland's* at 627.

**Focal cortical dysplasia** ("FCD") is a term used to describe a large spectrum of lesions increasingly recognized as a cause of medically refractory epilepsy. It can be in any part of the cortex and may affect multiple lobes. Pet. Ex. 22 at 2;[6] Resp. Ex. A Tab 16 at 2.[7] On neuroimaging, FCD findings include increased cortical thickness, blurring of the cortical-white matter junction, increased signal on T2-weighted images, and cortical thinning. Pet. Ex. 22 at 3. FCD typically presents in children but can begin in adulthood. Resp. Ex. A Tab 16 at 1. The most common seizure type in FCD is complex partial seizures. *Id*.

### III. Factual Background

### A. Medical History Prior to the Subject Vaccine

---

[4] Commission on Classification and Terminology of the International League Against Epilepsy, *Proposal for Revised Classification of Epilepsies and Epileptic Syndromes*, 30 Epilepsia 389 (1989), filed as "Resp. Ex. A Tab 1."

[5] *Id*.

[6] Ingmar Blumcke et al., *The clinicopathologic spectrum of focal cortical dysplasias: A consensus classification proposed by an ad hoc Task Force of the ILAE Diagnostic Methods Commission*, 52 Epilepsia 158 (2011), filed as "Pet. Ex. 22."

[7] A.M. Siegel et al., *Adult-onset epilepsy in focal cortical dysplasia of Taylor type*, 64 Neurology 1771 (2005), filed as "Resp. Ex. A Tab 16."

The primary care records begin in 2014. Petitioner's past medical history included but was not limited to pernicious anemia, vitamin D deficiency, insomnia, joint pain, fatigue, and malaise. Pet. Ex. 4 at 10-11, 14-15, 20-22.

Petitioner presented to her primary care physician ("PCP") Dr. Short on October 27, 2015, with "some problems lately." Pet. Ex. 4 at 20. She was 63 years old, reporting fatigue, waking in the morning having "really kicked her sheets everywhere . . . to the point now that they actually have tears in them", snoring a lot, waking not feeling rested, and feeling restless. *Id*. She was noted to have joint pain, insomnia, and fatigue. *Id*. at 21. Dr. Short's assessment included concerns for sleep problems causing fatigue, "some myoclonus[8] which is a sleep disorder", and "some sleep apnea symptoms" requiring a sleep study. *Id*. at 22-23, 26. Petitioner received a quadrivalent influenza vaccine at this visit. *Id*. at 23, 34.

Petitioner received the subject Tdap vaccine on December 5, 2015 at Walgreens. Pet. Ex. 1 at 8-9.

## B. Petitioner's Medical History After the Subject Vaccine

On December 8, 2015, petitioner was involved in a single vehicle accident while driving. She was transported to University Hospital by EMS,[9] who noted that her side airbag deployed, there was no visible head trauma or hematoma, and no known loss of consciousness. She was speaking in full sentences but was disoriented to time and year. She did not recall crashing her car. Pet. Ex. 2 at 8. She was evaluated by a nurse and ER resident, who noted at that time she was oriented to time and place and reported that she "has been suffering 'seizures sitting and staring spells' for past year. Has not seen a doctor." *Id*. She described these episodes as staring off, but she can still move and talk, just "feels slower." *Id*. at 10.

Petitioner suffered a seizure witnessed by her daughter while in the ER. She became confused, was unable to answer questions, began to shake, and was then post-ictal. She was given Ativan. A head CT was ordered. Pet. Ex. 2 at 12. Her daughter reported several similar episodes of unresponsiveness in the past year, described as staring off, not responding, without tonic/clonic movements, atonia, foaming at the mouth, or incontinence. The differential at that point included undiagnosed seizure disorder, among other conditions. *Id*. A neurology consult was ordered. *Id*. at 12-13.

Petitioner was taken for a head CT at which time the radiology technician reported a 1-2-minute episode of seizing with white foamy oral discharge. She was unable to communicate with staff and was then snoring audibly. Another 2mg of Ativan was administered. When next evaluated, she was oriented to time and place but did not recall the seizure event. She felt "drowsy." Pet. Ex. 2 at 9. Physical examination was normal. *Id*. at 11. There was no intracranial abnormality on CT. *Id*. at 14. A chest x-ray revealed a right posterior medial 10th rib fracture. *Id*. at 14-15.

---

[8] Myoclonus refers to shock-like contractions of a portion of a muscle, an entire muscle, or a group of muscles, restricted to one area of the body or appearing synchronously or asynchronously in several areas. *Dorland's* at 1205.
[9] The police report and EMS records were not filed.

Petitioner was loaded with Keppra in the ER and discharged home on oral Keppra. She was instructed not to drive, avoid alcohol, and follow up with neurology. Pet. Ex. 2 at 13. Information on seizures and rib fractures was provided. *Id*. at 38-42.

Petitioner presented to Dr. Helmstetter the next day, December 9, 2015, reporting her involvement in a motor vehicle accident yesterday morning secondary to seizure while exiting the parkway and hitting the guardrail. She was wearing a seatbelt. The side airbag deployed. It was unclear if she sustained any head trauma. She had no memory of the accident. She was seen in the ER, and a head CT was normal, but she sustained a rib fracture. She reported a "grand mall (sic) seizure while in the ER" but denied any history of seizures. Pet. Ex. 3 at 80. Keppra was prescribed. She denied confusion, headaches, vision changes, or history of any cardiovascular event. *Id*. She had mild bilateral shoulder pain with full range of motion of both shoulders and myalgias. The remainder of the examination was normal. *Id*. at 80-81. The assessment was unspecified convulsions, motor vehicle accident, rib fracture, and shoulder pain. *Id*. at 81. She was to continue taking Keppra. *Id*.

On December 11, 2015, petitioner presented to Dr. Hightower at SCPC Neurology. Her "problems" were listed as convulsions; partial symptomatic epilepsy with complex partial seizures, not intractable, without status epilepticus; seizure disorder, generalized convulsive, intractable; and anxiety. Pet. Ex. 3 at 84. Petitioner was being evaluated for "blacking out while driving" on December 8, 2015. *Id*. at 91. She reported losing consciousness while getting off at an exit, and the next thing she remembered was waking in an ambulance and then again in the ER. *Id*. She had another seizure while in the ER with her daughter, who reported foaming at the mouth, gurgling, and reaching for things in the air, for her blanket, and for the nurses, which lasted about 45 seconds with urinary incontinence. *Id*. at 92. Ativan was given after the seizure stopped. Petitioner reported that she had episodes of "déjà vu" for the past year, once a month or every other month. Her daughter witnessed an episode and reported that she stopped talking mid-conversation and when asked if she was having "an episode," petitioner nodded yes but could not speak for about 30 seconds. Petitioner reported that "[t]he last episode of this déjà vu feeling was Tuesday morning the same day she had two seizures." Petitioner described the episodes as wanting to talk but being unable to speak. She denied head trauma. She reported a febrile convulsion at age 2. Her son also had a febrile seizure at age 2. A head CT was negative. She was taking Keppra without side effects. *Id*. She reported still feeling confused with memory loss since the episodes on Tuesday with dizziness and anxiety. She had received a Tdap the Saturday before. *Id*.

Petitioner presented for her first brain MRI and EEG on December 24, 2015. Pet. Ex. 3 at 106. The MRI revealed abnormal edema signal with fullness within the left insula and left mesial temporal lobe with a suggestion of additional edema on the right insula and mesial temporal lobe. The findings were interpreted as related to seizure activity given her history, but encephalitis could not be excluded so clinical correlation with CSF analysis was recommended. Pet. Ex. 3 at 106-07. "Expanded differential includes limbic encephalitis." *Id*. at 107. The EEG performed the same day was "mildly abnormal [] with left temporal slowing . . . nonspecific and most often associated with vascular disease. No epileptiform potentials or electrographic seizures are identified at this time, however." *Id*. at 112-13.

A lumbar puncture ("LP") also performed on December 24, 2015 was normal with no infection found, a white blood cell ("WBC") count of 1 (normal), and only mildly elevated protein at 45, reference range of 15-40 mg/dL. Pet. Ex. 3 at 11, 15, 18, 122, 125. The discharging physician wrote that petitioner "appear[ed] remarkably well," and there was "low clinical suspicion for acute infectious etiology." *Id*. at 10. She was to follow up with neurology. *Id*. at 121.

In an email from neurologist Dr. Elkayam on December 29, 2016, petitioner was advised that some results on LP were still pending, but it was doubtful the seizures were related to an infection. Additionally, the "EEG does not show herpes in the brain." Pet. Ex. 3 at 137. On December 31, 2015, Dr. Elkayam advised petitioner that the CSF results showed no infection or cancer cells. *Id*. at 140.

Petitioner presented to Dr. Elkayam on January 6, 2016. She was previously seen by Dr. Hightower. Her first seizure was unwitnessed and resulted in a motor vehicle accident, and the second was witnessed in the ER by her daughter. Pet. Ex. 3 at 157. Dr. Elkayam received the MRI results; due to a question of viral encephalitis, an LP for CSF was ordered. "The cytology of the CSF, white blood cell count, CMV/HSV/Lyme's/RPR/West Nile are negative/unremarkable. The protein was slightly elevated. Her EEG showed some focal slowing [] consistent with the MRI findings, but no evidence of periodic complexes, epileptiform activity." *Id*. This was explained to petitioner and her daughter. *Id*. Dr. Elkayam's assessment was abnormal brain MRI, seizure disorder, and unspecified convulsions. *Id*. at 160, 167. The plan was to repeat the EEG and MRI, as well as order a paraneoplastic serum antibody panel to test serology for anti-Hu, anti-Ma2, and anti-NMDAR antibodies. *Id*. at 157, 161. She was allowed to drive if she took the Keppra. *Id*.

In an email to Dr. Elkayam on January 9, 2016, petitioner questioned whether the Tdap vaccination was the cause of her seizures. Pet. Ex. 3 at 176. Dr. Elkayam's response included only that the paraneoplastic panel antibodies were normal, and she did not have to return but should see Dr. Ramsay, who was a seizure specialist. *Id*. at 182, 211-212, 255.

Repeat brain MRI and EEG were performed on January 11, 2016. The MRI revealed near normal findings with the prior abnormal fullness and edema signal within the left mesial temporal lobe almost resolved. Pet. Ex. 3 at 175, 185-86. The repeat EEG was mildly abnormal with background frequencies a little slower than expected for an adult, indicating a mild nonspecific and non-focal encephalopathy. The clinical correlation was "mild nonfocal cortical dysfunction, which could be related to a metabolic or toxic process and also could be late residual of a convulsion." *Id*. at 192.

Petitioner sent an email to Dr. Short on January 16, 2016 about an "adverse reaction to the Tdap shot" and "grand mal seizure" in her car within 72 hours of vaccination with another grand mal seizure while in the ER, abnormal MRI concerning for herpes encephalitis, and lumbar puncture that "tested for everything from cancer cells to Lyme, West Nile, herpes encephalitis, and even syphilis of the brain", and "[e]verything came back clear except for a slightly elevated protein level." Petitioner added that she never had a seizure before in her life. Petitioner questioned whether she should get the shingles vaccine. Pet. Ex. 4 at 43. A response from Dr. Short's office included that it "sounds like a viral meningitis but that [it's] not from the vaccine and that it goes away." *Id*. Petitioner was also advised to not receive the shingles vaccine at this time. *Id*.

7

Petitioner sent another message to Dr. Elkayam on February 3, 2016, advising that she was submitting a VAERS report and recently experienced "night and day" of déjà vu episodes but was doing well and back to volunteering. Pet. Ex. 3 at 244.

Petitioner presented to Dr. Ramsay for consultation on April 28, 2016. She provided her history which included insomnia and taking two Tylenol PM tablets nightly for 8 years. Pet. Ex. 3 at 256-57. She had a "DPT" vaccine 5 days prior to seizures. *Id*. at 257. Dr. Ramsay discussed her prior test results. *Id*. at 257, 259-60. Neurological examination was normal. *Id*. at 262-63. His impression was "DPT reaction producing mild mesial temporal edema which has improved", insomnia, and "[p]rovoked seizure – the temporal relationship of the DPT shot and the seizure and the MRI changes suggest the seizure was from a reaction to the DPT. Follow up MRI showed resolution of the changes." *Id*. at 263. An ambulatory 48-hour EEG and MRI with epilepsy protocol were ordered. Keppra was to continue. *Id*.

Repeat MRI performed on May 3, 2016 revealed no definite abnormalities or significant detrimental changes when compared to the prior MRI. Pet. Ex. 3 at 281-82. The previously-visualized abnormal fullness and edema within the left mesial temporal lobe and insula was largely resolved. *Id*.

A 48-hour ambulatory EEG was ordered by Dr. Khan on referral from Dr. Ramsay on May 4, 2016 to assess for underlying epilepsy. Dr. Khan's impression was "abnormal EEG during wakefulness, drowsiness and sleep. Independent left and right temporal focal polymorphic delta range slowing was noted. Left temporal slow wave complexes were noted. Left temporal sharp waves were also noted." Pet. Ex. 3 at 287-89. Dr. Khan's "clinical correlation" included a 63-year-old female with "a history of generalized seizures following vaccination." *Id*. at 289. The findings on 48-hour EEG were previously reported on EEG in December of 2015. The left temporal sharp waves confer an increased risk of focal seizures from this region. No seizures were recorded during the study. *Id*.

Petitioner sent an email to Dr. Ramsay on May 28, 2016, describing feelings of "doom and dread", and believed the Keppra was causing anxiety. Pet. Ex. 3 at 327. Dr. Ramsay phoned petitioner who reported feeling better. She was told to try melatonin for sleep rather than the Benadryl (Tylenol PM) she was taking. *Id*. at 330.

Petitioner returned to Dr. Ramsay on June 27, 2016. His impressions remained unchanged. Pet. Ex. 3 at 335, 339, 348. Her test results indicated the need for continued treatment with Keppra. *Id*. at 348.

Petitioner sent an email to Dr. Ramsay on October 3, 2016 about receiving the flu vaccine in light of two "grand mal" seizures after the Tdap vaccine. Pet. Ex. 3 at 369. Dr. Ramsay's office advised her to get the flu vaccine. *Id*. at 372.

Petitioner returned to Dr. Ramsay on January 4, 2017 and reported a lot of anxiety and déjà vu episodes in December of 2016 after she missed taking Keppra for several days, which stopped

when she restarted Keppra. Pet. Ex. 3 at 408. She was advised to take the Keppra as prescribed. *Id*. at 416.

Petitioner presented to a new PCP on May 26, 2017 and reported that she was taking Keppra for seizures but had not had any seizures in 2 years. Pet. Ex. 6 at 70. Her medical history included arthritis, lipoma, seizures, and "[e]ncephalitis due to human herpes simplex virus (HSV)."[10] Pet. Ex. 6 at 64.

It appears petitioner did not see Dr. Ramsay again until March 27, 2018, over a year after her last visit. The record now included a diagnosis of "[p]artial symptomatic epilepsy with complex partial seizures, not intractable, without status epilepticus." Pet. Ex. 6 at 150. She reported monthly episodes of "auras" and déjà vu feeling like something was going to happen. She does not lose awareness during these episodes and can respond verbally. She was taking Keppra but was concerned it causes depression. *Id*. at 153. She had no seizures since December 11, 2015.[11] *Id*. at 155. Dr. Ramsay documented no prior history of febrile seizure or family history of seizures. *Id*. at 157. His impression remained "DPT reaction producing mild mesial temporal edema which has improved", insomnia, and "[p]rovoked seizure – the temporal relationship of the DPT shot and the seizure and the MRI changes suggest the seizures was (sic) from a reaction to the DPT. *Id*. at 161. He ordered eslicarbazepine ("Aptiom") 800mg to start, which may increase to 1600mg depending on blood level, and taper of Keppra to 500mg when Aptiom is started. *Id*.

Petitioner sent an email to Dr. Ramsay on March 30, 2018, stating that the addition of 800mg of Aptiom caused such extreme dizziness, nausea, and vertigo that she could not get out of bed in the morning. Pet. Ex. 6 at 178. She was advised to decrease the Aptiom to 400mg and continue with Keppra taper. *Id*. at 182. Petitioner responded a few days later that she felt fine with 400mg of Aptiom and 250mg of Keppra. *Id*.

A repeat MRI of the brain performed on April 2, 2018 revealed "subtle expansion with ill-defined T2/FLAIR hyperintensity involving the cortex of the anteromedial aspect of the left temporal lobe . . . concerning for focal cortical dysplasia or low-grade glioma." The record included that "[o]verall findings thought likely similar to that of prior studies, although better delineated noting the use of a 3 Tesla magnet on today's exam." Pet. Ex. 6 at 197, 217. Aptiom dosage was increased, and Keppra was discontinued. *Id*. at 225, 229.

In response to an email from petitioner, Dr. Ramsay's office confirmed there were no significant changes from her prior MRI studies. However, Dr. Ramsay was consulting with other physicians and looking more closely at the study. Glioma[12] was not yet confirmed. Pet. Ex. 6 at 204.

---

[10] Herpes encephalitis, and encephalitis in general, was ruled out by lumbar puncture which was negative for infection. Pet. Ex. 3 at 157; Pet. Ex. 8 at 11-18.

[11] Apart from her auras and déjà vu episodes, her last seizure was on December 8, 2015.

[12] Glioma was initially understood to be a tumor composed of tissue representing neuroglia in any of its stages of development but now is extended to include all the primary intrinsic neoplasms of the brain and spinal cord. *Dorland's* at 775.

Petitioner returned to Dr. Ramsay on April 9, 2018 and was advised that neuroradiology review of the MRI confirmed cortical dysplasia as the most likely finding on the images. Pet. Ex. 6 at 217. She was to take 800mg of Aptiom and stop Keppra with levels tested in a week. *Id*. at 225. Petitioner sent an email to Dr. Ramsay to confirm that he no longer wanted her to see Dr. Bui, who he referred her to for possible surgery for seizures. *Id*. at 237.

At her visit with Dr. Ramsay on July 11, 2019, she reported absence seizures while on Aptiom. Pet. Ex. 39 at 33, 50, 80, 86.

The next day, she was transported to the hospital via ambulance and was actively seizing. Pet. Ex. 43 at 84, 88. Her daughter reported convulsions with stiffness and foaming at the mouth. *Id*. at 84. A history of seizures, encephalitis secondary to HSV, absence seizures once a month, and a recent increased dosage of Aptiom causing illness were reported. *Id*. at 84, 89, 91, 93-94. Lab work revealed low sodium (hyponatremia). Pet. Ex. 42 at 189. She was admitted to the ICU, treated for hyponatremia, switched back to Keppra, and discharged on July 17, 2019. *Id*.; Pet. Ex. 43 at 98-99.

The following year, on July 16, 2020, petitioner presented to a new neurologist, Dr. Eady, for "[e]pilepsy." Pet. Ex. 29 at 57. Petitioner reported a history of a first seizure in December of 2015, first déjà vu event in 2012 during a walk for colon cancer, two febrile seizures at age 2, and receipt of a pertussis vaccine with "?encephalitis." Her son had a febrile seizure, otherwise there was no family history. There was no head trauma, loss of consciousness, or central nervous system infections. She reported about 75 episodes of déjà vu, 2 seizures in 2015, 1 in 2019, and 2 at 2 years of age. *Id*. at 58. She reported that she can have clusters of déjà vu episodes in a day then none for a year but always at the same time during the month, with most triggered by stress, lack of sleep, and possibly hormones. They occur mid-sentence where she is unable to respond but remains aware. She has feelings of impending doom and déjà vu for 30 seconds, then she comes "right back out of it." Some episodes cluster with 3 in an hour. She reported being better using biofeedback, pleasant thoughts, and breathing exercises. She was hospitalized[13] for seizures in 2015 after a pertussis shot and again in July of 2019 after increasing Aptiom with nausea and hyponatremia. *Id*. Dr. Eady's assessment was left temporal lobe epilepsy and essential tremor. *Id*. at 60. Her brain MRI shows left amygdala enlargement – "FCD vs slow-growing neoplasm vs sequela of encephalitis vs ictal sequela." EEG shows left sharp waves. Dr. Eady referred her to infectious disease[14] for "presumed encephalitis" after DPT. *Id*.

Petitioner presented to Dr. Eady a year later on June 17, 2021, reporting that she was working in her garden with no seizure events. She had received all vaccinations except the pneumococcal vaccine. Shingles made her arm hurt, she had no issues with the Pfizer COVID vaccine, she was very active, watches her granddaughters, rides her bike for 7-10 miles, and had no complaints. Pet. Ex. 29 at 9-10.

Only two visits with Dr. Eady were filed. No further records were filed.

---

[13] Petitioner was treated in the ER and discharged.

[14] The records show that petitioner attempted to make an appointment with an infectious disease physician but was not able to get anything scheduled. Pet. Ex. 34 at 161; Pet. Ex. 35 at 46-50.

## C. VAERS Reports

Multiple VAERS reports were filed. A typed VAERS report was completed by petitioner on December 12, 2015 and included that she was "driving, getting off the interstate and evidently had a seizure. I remember very little of the next 8 or so hours in the trauma center. I had no warning." Pet. Ex. 33 at 1.

A second typed report dated December 28, 2015 was completed by petitioner and included a "Grand Mal Seizure while driving", transport to a trauma center, "grand mal seizure again", put on Keppra, MRI, EEG abnormal, lumbar puncture, WBC normal. Pet. Ex. 33 at 3. Medical records were attached. *Id*. at 4-26.

A handwritten VAERS report with a fax date of January 12, 2016 was competed by Edward Mendez, pharmacy manager at Walgreens, and included Tdap vaccine given on December 5, 2015, everything was fine, but 3 days later she had a seizure and was involved in an auto accident. She went to the ER and had another seizure. She is under the care of a neurologist. Pet. Ex. 33 at 27. Medical records were attached. *Id*. at 28-48.

A fourth VAERS report, handwritten by petitioner, was completed on December 18, 2015 and refers to Tdap and flu vaccines given within 30 days of each other. Pet. Ex. 33 at 49.

A fifth typed VAERS report was completed by Jorge Pesquera, dated May 17, 2016, and included seizures, edema of the brain/temporal lobe swelling, and elevated CSF protein. Pet. Ex. 33 at 50. Attached is a typed "Event Description" that was "reported by a physician via call center representative" of a 63-year-old female patient who received a "DTPa (Reduced antigen) (Boostrix)" and five days later experienced a seizure. In December of 2015, petitioner experienced brain edema, CSF increased protein, and was treated with Keppra. On an unknown date, the outcome of the seizure, brain edema, and CSF protein increase was recovering/resolving. "It was unknown if the reporter considered the seizure, brain edema and cerebrospinal fluid protein increased to be related to Boostrix." It was noted that petitioner had no past medical history of seizures, had a seizure while driving which resulted in an accident, was taken to the ER and admitted for an unknown amount of time, experienced brain edema of the temporal lobes seen on MRI on December 24, 2015, and elevated protein on CSF. Other blood work was normal. Repeat MRI on May 3, 2016 showed edema had resolved. *Id*. at 51.

A sixth VAERS report dated December 3, 2016 was completed by F. Khan and includes "[a]ctivation of latent temporal lobe epilepsy…seizures…edema of the brain / Temporal lobe swelling…motor vehicle accident." The vaccination date is listed as December 3, 2015. Pet. Ex. 33 at 54. The "Event Description" contained on a separate page was reported by a physician to the call center representative and included that petitioner received a Boostrix on December 3, 2015, five days later experienced a seizure, presented to the ER, had brain edema and increased protein in CSF in December of 2015, was treated with Keppra, and brain swelling and CSF levels were recovering/resolving by an unknown date. "It was unknown if the reporter considered the seizure, brain edema and cerebrospinal fluid protein increased to be" vaccine-related. The remainder of that page was similar to the previous one filed but included follow up information received on November 27, 2016, adding temporal lobe epilepsy, motor vehicle accident, and a medical history

11

that included "a single febrile seizure" and current condition of monthly "déjà vu episodes with speech arrest." The time from vaccine to onset of seizure changed from 5 days to 3 days. Also added were lab results and that this was described in a case report as "activation of latent [temporal lobe epilepsy]" with Boostrix. *Id*. at 55-57.

### D. Petitioner's Affidavits[15]

Petitioner affirmed receipt of a Tdap vaccine on December 5, 2015 at Walgreens, then "experienced grand mal seizures caused by the [Tdap] vaccination" and has suffered the "residual effects or complications of the seizures" for more than six months. Pet. Ex. 5 at 1.

In a later affidavit, petitioner detailed one "déjà vu episode" in March of 2013 while on a 5-mile walk at a fundraising event. Pet. Ex. 25 at 1. She was "very aware" of her surroundings and had an "overwhelming sense of dread." She was under a lot of stress at the time. *Id*.

Petitioner reported the event to Dr. Short along with the stress she was under, but Dr. Short felt no testing was necessary.[16] After that episode, she described being overwhelmed at times, getting "a little fuzzy", and having "to really focus on what was" before her, but she had no further episodes like the one the day of the fundraiser. It did not affect her work, family, or home environment. She did not have episodes in front of family or friends. Pet. Ex. 25 at 1.

Petitioner affirmed that she sold her house, "left [her] profession", and moved in 2014. Even though overwhelmed, there were no further episodes until "perhaps August of 2015" when she "zoned out" at a yard sale while with her daughter. Pet. Ex. 25 at 1-2. This was the second time she experienced déjà vu "where [she] felt overwhelming dread, was aware of [her] surroundings, but the dread kept [her] from answering her question." *Id*. at 2.

Petitioner affirmed she never had any prior adverse reactions to vaccinations and did not recall any immediate reaction to the "DPT" vaccine on December 5, 2015, other than the usual sore spot. Pet. Ex. 25 at 2.

Petitioner described the morning of December 8, 2015. It was a clear, cool day. While driving, she encountered construction and traffic and got off at her exit which "is the last thing [she] remember[s]." Pet. Ex. 25 at 2. She did not remember the accident, the aftermath, or the birth of her granddaughter a week later. She recalled visiting a doctor, a referral to and seeing a neurologist, having a brain scan on Christmas Eve, and being asked to return to the hospital that day for a lumbar puncture due to the possibility of herpes encephalitis. *Id*.

Petitioner recalled seeing another neurologist over the next several months who ordered multiple tests. She saw Dr. Ramsay in June of 2016 and asked when she could stop taking Keppra.

---

[15] Petitioner filed a third affidavit on December 5, 2022, detailing a car accident in August of 2013. Pet. Ex. 45. Petitioner's affidavit appears consistent with the police report for that accident. Pet. Ex. 49. Petitioner filed photographs of both cars involved. Pet. Ex. 46.
[16] None of the records filed from Dr. Short's office contained this information.

12

She was told the "lesions had diminished, [but] the encephalitis caused permanent changes on [her] brain" and she needed medication for life. Pet. Ex. 25 at 3.

She recalled it was at this point, "or perhaps a little later," that she became cognizant of episodes of "absence seizures" at least once a month, with feelings of dread, not sleeping well the night before, and having multiple episodes the next day sometimes with nausea beforehand and being very tired afterward. She was never unaware of her surroundings. Pet. Ex. 25 at 3.

Petitioner told Dr. Ramsay about these episodes in 2017, but nothing was done until she reported the episodes again in March of 2018. He changed her medication to Aptiom which immediately made her ill with extreme nausea and dizziness. Pet. Ex. 25 at 3. After another MRI, "all of a sudden" Dr. Ramsay said she had "focal cortical dysplasia." He became "short" with her when she asked why there was a new diagnosis not contained in prior MRIs and would not answer her questions.[17] She then had "at least monthly episodes of what [she] was then told were absence seizures in spite of the medication." *Id*.

Petitioner took the Aptiom Dr. Ramsay prescribed but continued having absence seizures. In May of 2019, she cut back on carbohydrates, which seemed to curb the absence seizures.[18] Pet. Ex. 25 at 3.

Dr. Ramsay told her to keep a diary of the episodes. In July of 2019, she told him she had seizures once a month and he told her to take 800mg of Aptiom in the morning and 800mg at night. When she took the extra dose that evening, she became ill, unable to walk, and extremely nauseous. She called Dr. Ramsay's nurse and was advised to cut back on the medication. Pet. Ex. 25 at 3-4. However, she developed absence seizures, had grand mal seizures, was transported to Ochsner Hospital, and spent 5 days in the "Neuro ICU." Aptiom was stopped, Keppra was restarted, and she has been seizure-free since. She stopped seeing Dr. Ramsay in July of 2019 and now sees Dr. Eady. *Id*. at 4.

### E. Affidavit of Kate Uhle

Ms. Uhle is petitioner's daughter. Pet. Ex. 26 at 1. She described a day in the fall of 2015 when she was having a conversation with petitioner at a yard sale and petitioner just stopped responding. Petitioner nodded slightly when Ms. Uhle asked if petitioner had heard what she said. Her eyes were moving around. Petitioner nodded slightly when Ms. Uhle asked if she was okay. The episode lasted about a minute, then petitioner "just started talking again… explaining what happened," that she could hear Ms. Uhle and knew what was being said but could not respond. Ms. Uhle never saw that happen before or at any point thereafter. *Id*.

Ms. Uhle was having her first child in December of 2015, and it was recommended that petitioner receive the whooping cough vaccine since she was going to be the baby's primary caregiver when Ms. Uhle went back to work. Ms. Uhle did not remember the dates but believed within 48 hours of petitioner's receipt of the vaccine, she received a phone call from her husband

---

[17] There appear to be no records that correspond with this conversation.
[18] *Id*.

that petitioner had been involved in a car accident and was being taken to the hospital. Pet. Ex. 26 at 1. Upon Ms. Uhle's arrival at the hospital, petitioner was on a stretcher in a neck brace, and "very foggy and confused and kept asking [] what had happened and where she was." She knew her name and birthday but not who the president was or what they had named the baby. She repeated the same questions, unable to retain any information from moments before. *Id.*

Ms. Uhle affirmed that petitioner had a seizure while in the ER with body convulsions and foaming at the mouth. Afterward, she did not remember Ms. Uhle's or Mr. Uhle's names or her address. Petitioner was sent home after she stabilized and underwent many tests. Pet. Ex. 26 at 2.

Ms. Uhle referred to the next several weeks as a "blur," she had a newborn, and petitioner was constantly confused with no recollection of the events over the past weeks. On Christmas Eve, petitioner received a phone call to return to the ER because they thought she had "encephalitis on her brain scan and warned her of the highly contagious nature of this." Pet. Ex. 26 at 2. Everyone was afraid for petitioner and because she had been around the newborn for two weeks. The brain images confirmed "no significant sign of encephalitis." *Id.*

Ms. Uhle described petitioner as confused with trouble remembering things throughout the day following the car accident. She would repeat conversations, ask questions already answered, and continually ask about the accident. Pet. Ex. 26 at 2. She started having absence seizures. Dr. Ramsay prescribed medication and said these episodes were "normal and would continue to happen." Ms. Uhle recalled being at a visit to Dr. Ramsay when he mentioned "permanent changes on the brain", requiring medication for life. He also mentioned the possibility of a brain tumor which he later dismissed. *Id.*

Ms. Uhle affirmed petitioner talked of frequent "episodes" over the years, not liking how the medication made her feel, spotty memory, and episodes of sadness and depression. Pet. Ex. 26 at 2. She recalled that in July of 2019, Dr. Ramsay doubled petitioner's medication to eliminate the absence seizures but a "few days" later, petitioner did not feel well, threw up, was dizzy, nauseous, tired, "puzzled" about why Ms. Uhle was there, and made no sense when Ms. Uhle asked her questions. *Id.* Ms. Uhle's husband called his brother who is an EMT and told them to call 911. *Id.* at 3. Petitioner's confusion continued, she did not recognize Mr. Uhle, then "she 'came to'" and started answering questions correctly. She explained to the EMTs how she felt, and they recommended she go to the ER but could go by car. *Id.* While getting ready to go to the hospital, Ms. Uhle found petitioner having a full body convulsion, groaning, and drooling in the bathroom. She then became "stiff and rigid and shaking horribly." Ms. Uhle "screamed for [her] husband to call 911 again." After a minute or so, she stopped seizing and stopped breathing, went completely limp, then suddenly took a large gasp of air and started snoring as though sleeping deeply. *Id.* The ambulance took her to the hospital. She was confused and could not form sentences or answer questions. She had seizures in the ER with full body convulsions and foaming at the mouth. She could not stay awake and when she was awake, she could not speak. She spent several days in the ICU and had many tests. She was "hooked to a brain monitor that recorded activity as she would have episodes." *Id.*

According to Ms. Uhle, petitioner is no longer the person she was before the vaccine. She was a teacher who remembered equations and scientific formulas. She now repeats herself and has

14

to be reminded of stories. Ms. Uhle worries "constantly. . . [that] she is unconscious in her home." Pet. Ex. 26 at 3-4.

## IV.    Expert and Treating Physician Opinions

### A. Petitioner's Expert, Dr. Nahm[19]

Dr. Frederick Nahm[20] opined that the Tdap vaccination petitioner received caused encephalitis, resulting in tonic/clonic generalized seizures, abnormalities of cerebral edema seen on MRI, and focal left and right temporal slowing on EEG. Pet. Ex. 9 at 9. He discussed how anti-NMDA receptors can produce an abnormal immune response to Tdap vaccination in some people, trigger the loss of surface NMDA receptors, and lead to a defect in synaptic function and an alteration in the balance between excitatory and inhibitory synaptic inputs. *Id*. at 6. Pertussis vaccine specifically has been shown to result in overexpression of microRNA, which is associated with anti-NMDA receptor encephalitis. *Id*.

According to Dr. Nahm, petitioner had no prior history of generalized seizures and this new seizure within a reasonable degree of medical certainty was a response to the Tdap vaccination. Pet. Ex. 9 at 7. Further, there was "irrefutable evidence" that petitioner had encephalitis, with demonstrated neurological dysfunction in the form of generalized seizures, confusion, and memory loss. Despite the lumbar puncture being "largely normal," her CSF protein was elevated, which is a marker for "encephalitides." The initial elevation of her WBC could have resolved by the time the LP was performed 16 days after the car accident. *Id*.; Pet. Ex. 17;[21] Pet. Ex. 18.[22] Finally, edema on brain MRI is common in encephalitis. Pet. Ex. 9 at 7; Pet. Ex. 19.[23] The improvement in edema on subsequent MRIs is consistent with an autoimmune or inflammatory process and encephalitis. Pet. Ex. 9 at 8.

Further, Dr. Nahm argued that encephalitis could not be excluded because there was no documented underlying malignancy or other abnormality that would explain her symptoms. Pet. Ex. 9 at 8. He disagreed that petitioner had cortical dysplasia, which is a malformation deformity present at birth and questioned how this developmental abnormality was not seen on initial MRIs. *Id*.; Pet. Ex. 20 at 1, 3. He argued it was more likely that the vaccine led to temporal lobe inflammation and "directly resulted" in the abnormality identified as cortical dysplasia, which was only seen "well after the [Tdap] and the petitioner's likely encephalitis." Pet. Ex. 9 at 8; Pet. Ex. 20 at 2-3.

---

[19] Petitioner first retained Dr. Nahm, who authored two reports filed in this matter. Pet. Ex. 9; Pet. Ex. 20. Petitioner confirmed in a status report that she was not using Dr. Nahm's opinion in support her Motion for Ruling on the Record. ECF No. 80. Thus, Dr. Nahm's reports are only briefly discussed because they are still part of the record.

[20] Dr. Nahm is a practicing neurologist and is board certified in Psychiatry and Neurology. He holds an M.D. and a Ph.D. Pet. Ex. 9 at 1.

[21] V. Fominykh et al., *Neuronal damage and neuroinflammation markers in patients with autoimmune encephalitis and multiple sclerosis*, 34 Metabolic Brain Disease 1473 (2019), filed as "Pet. Ex. 17."

[22] David N. Irani, Cerebrospinal Fluid in Clinical Practice (2008), filed as "Pet. Ex. 18."

[23] Michael E. Zapadka, *Temporal Lobe Signal Abnormality*, 4 J. Am. Osteopathic College of Radiology 22 (2015), filed as "Pet. Ex. 19."

Dr. Nahm argued that no evidence existed that was sufficient for a diagnosis of seizures prior to vaccination. Pet. Ex. 9 at 7; Pet. Ex. 20 at 3-5. Déjà vu episodes are "common in the general population" and petitioner did not have the distinct characteristics of déjà vu in temporal lobe epilepsy which includes derealization, hallucinations, abdominal sensations, and fear. Pet. Ex. 9 at 7; Pet. Ex. 20 at 5. Further, petitioner only had a generalized tonic/clonic seizure post-vaccination, "thus this is a new neurological condition that did not exist prior to the Tdap vaccination." Pet. Ex. 9 at 7.

Dr. Nahm's arguments and opinions are contrary to the medical records. Thus, even though no longer relied upon by petitioner, they are still part of the record but are given little weight.

### B. Petitioner's Physician, Dr. Eady

Dr. Tiffany Eady[24] authored a letter dated February 3, 2022, writing that petitioner came under her care in July of 2020 for focal epilepsy. Based on imaging, Dr. Eady favors cortical dysplasia in the area of the left amygdala that has been stable for several years. Pet. Ex. 32 at 1. She described this area of the brain as "extremely sensitive and has a high propensity to develop seizures with any injury or inflammation." *Id*. Dr. Eady included petitioner's history of two febrile seizures as a child which were self-limited and several episodes of focal onset "auras" that were brief with preserved awareness and self-limited with no spread or secondary generalization and did not require medication. *Id*.

According to Dr. Eady, petitioner received a Tdap vaccination and several days later had several episodes of generalized convulsion with loss of awareness which resulted in a car accident with injury and subsequent significant increase in aura frequency. Pet. Ex. 32 at 1. "The etiology of the seizures was felt to be secondary to inflammation of the left mesial temporal structures indicated by swelling (edema) in these structures as a direct reaction to the vaccine." *Id*. Dr. Eady submitted that encephalitis is an inflammation within the tissues of the brain, unlike meningitis which is inflammation on the surface of the brain and it is possible to have encephalitis without CSF changes. *Id*. Following these episodes, petitioner required treatment with anti-seizure medications and had another convulsion in the setting of hyponatremia secondary to side effects from one of the medications. "We will never know what her course would have been had she not gotten the vaccination . . . considering the time course of events, is (sic) medically reasonable to assume the vaccination was in part responsible for the focal brain inflammation and subsequent seizures." *Id*.

### C. Petitioner's Expert and Physician, Dr. Khan

Dr. Fawad Khan[25] is a neurologist. Dr. Khan routinely interprets EEG studies and participated in petitioner's treatment on May 9, 2016 following review of her chart and the 48-

---

[24] Dr. Eady's CV was not filed into the record. According to the Ochsner Health website (https://blog.ochsner.org/biographies/tiffany-eady-md-phd/), Dr. Eady holds an M.D. and Ph.D. and is a subspecialist in epileptology.

[25] According to Dr. Khan, he is a full-time academic neurologist at Ochsner Health in New Orleans, Louisiana. He is also an associate professor at Ochsner Clinical School and is board-certified in neurology, epilepsy, and clinical

hour EEG performed between May 4-6, 2016. Pet. Ex. 50 at 1. His report included what he learned from her chart, more specifically that she was a 63-year-old woman with a prior history of a "single febrile seizure" and self-described "intermittent episodes of déjà vu and staring spells for approximately one year prior to the visit." These clinical events were "highly suggestive of focal seizures originating in the limbic cortical regions in the brain." There was no reported loss of consciousness or full body convulsions with these prior episodes. *Id*.

From petitioner's chart, Dr. Khan learned that she had received a Tdap vaccination and three days later lost consciousness while driving. Pet. Ex. 50 at 1. "She did report episodes consistent with focal seizures 2 days prior to the seizure while driving." She had no new medications, alcohol, or drugs prior to the seizure while driving. She was taken to the hospital, was alert with some disorientation while in the ER, then suffered another seizure with loss of consciousness, foaming at the mouth, gurgling, urinary incontinence, followed by a post-ictal state consistent with an electrographic seizure. After being stabilized, she was discharged home with anti-seizure medication. *Id*.

Dr. Khan discussed the objective testing performed including, blood tests, brain MRI, EEG studies, brain positron emission tomography ("PET") scan, and cerebrospinal fluid analysis ("CSF"). Pet. Ex. 50 at 2. He wrote that the December 24, 2015 brain MRI demonstrated abnormal edema signal with slight fullness of the left mesial temporal lobe and insula lobe, with suggestion of additional edema at right mesial temporal lobe and insula lobe, "highly suggestive of encephalitis." An MRI of the brain one month later revealed mild improvement of the abnormal signals previously seen. An MRI of the brain three months later showed resolution of the abnormal edema signals. The PET scan of the brain was unremarkable. The CSF testing performed on December 24, 2015 was unremarkable but for "mildly increased protein at 45", suggestive of encephalitis. A paraneoplastic panel of the serum was non-revealing. *Id*.

Dr. Khan discussed the EEG findings. The first EEG done around December 24, 2015 at the time of the first MRI showed abnormal left temporal slowing, a feature suggestive of temporal lobe dysfunction. Pet. Ex. 50 at 2. The second EEG three weeks later was similar. The third EEG, performed three months later when the third brain MRI showed resolution of the abnormal edema signals, revealed independent left and right temporal focal polymorphic delta range slowing and left temporal sharp waves. These findings were suggestive of dysfunction of both the left and right temporal lobes and a focal epilepsy disorder. *Id*.

In a section of his report titled "Expert review", Dr. Khan discussed submitting a case report on petitioner to a national conference which was accepted for presentation by the American Epilepsy Society[26] Annual Meeting on December 5, 2016, titled "Activation of Latent Temporal Lobe Epilepsy After Tdap Vaccine (Boostrix®) – MRI and EEG Correlates."[27] A copy of the abstract was filed. Pet. Ex. 50 at 2-3. The abstract includes only the "Results" that the patient

---

neurophysiology. He has practiced since 2012 and serves as the section head of the epilepsy division of Ochsner Neurosciences Institute. Pet. Ex. 50 at 1.

[26] In response to a subpoena, the American Epilepsy Society stated that it had no responsive documents, that only the abstract of the study was published, and provided a link. Pet. Ex. 44. The full study was never filed in this case.

[27] The case study was authored by Dr. Khan, Dr. Ramsay, and Jorge Pesquera (who submitted one of the various VAERS reports filed). *See* Pet. Ex. 33 at 50.

remained seizure free as of November 22, 2016 (when published) while on Keppra. Pet. Ex. 44 at 2. It also notes that the CSF showed mildly elevated protein, and paraneoplastic panel was negative; an initial MRI revealed abnormal fluid-attenuated inversion recovery (FLAIR) signal hyperintensity within the bilateral insula and mesial temporal lobes without enhancement, left worse than right with resolution of the abnormalities by the third MRI study; PET scan of the brain was unremarkable; initial EEG revealed focal slowing in the left temporal region; repeat EEGs revealed independent left and right temporal focal slowing as well as left temporal sharp waves. *Id*. The "Conclusions" included that seizures were not reported in clinical trials for the Boostrix vaccine, however post-marketing surveillance included several neurological complications including questionable GBS, Bell's palsy, seizure, demyelinating diseases, and encephalopathy/encephalitis. Some of these patients had a history of anti-convulsive treatment, EEG abnormalities, and seizures before vaccination. *Id*. The subject of this case study (petitioner) had a "clinical history preceding the seizure along with EEG findings [that] supports a diagnosis of temporal lobe epilepsy (TLE). Although it is possible that the seizures following the vaccination was only a coincidental temporal association, the development of focal encephalitis and clinical seizures shortly after the vaccination and improvement in the MRI signal abnormality over time are highly suggestive of a direct consequence of the vaccination. This phenomenon would support the theory that TLE may have an underlying neuro-inflammatory pathogenesis." *Id*. at 2-3.

Dr. Khan provided the ingredients of the Boostrix vaccine (Tdap) which includes tetanus toxoid, diphtheria toxoid, and inactivated pertussis antigens, as well as formaldehyde-treated filamentous hemagglutinin and pertactin, aluminum hydroxide, sodium chloride, residual formaldehyde, and polysorbate 80. He noted that a clinical trial prior to approval was significant only for headache post-vaccination.[28] Pet. Ex. 50 at 2.

Dr. Khan cited *Chang* and *Sun* in support of his opinion that the Boostrix vaccine can cause seizures. He wrote that *Chang* observed post-marketing surveillance of the Boostrix vaccine a total of 28 cases with seizures after vaccination with Tdap and other concomitant vaccines including meningococcal, Hep A, Hep B, Varicella, and MMR, and 9 cases after Tdap alone. The median age was 15 with a range between 9 and 38 years of age. Six of the 28 cases had a prior history of anti-convulsive treatment or EEG abnormalities prior to vaccination, while seven of the 28 cases had a history of seizures including 2 who had seizures following prior vaccination. Pet. Ex. 50 at 3; Pet. Ex. 51.[29] *Sun* was a population-based study of children in Denmark who received the combined diphtheria-tetanus toxoids-acellular pertussis-inactivated poliovirus-Haemophilus influenzae type b (DTaP-IPV-Hib) vaccination and showed a small increased risk of "febrile seizures" on the day of the first two vaccinations at 3 and 5 months of age. "Vaccination, however, was not associated with an increased risk of epilepsy." Pet. Ex. 50 at 3; Pet. Ex. 52.[30]

Dr. Khan opined that petitioner suffered encephalitis from the Tdap vaccination. He described encephalitis as the result of a "complex neuro-inflammatory process" and relied on *Herve* to show that vaccinations lead to a "complex cascade of immunological activations," which

---

[28] The reference was to a link.

[29] Soju Chang et al., *U.S. Postlicensure safety surveillance for adolescent and adult tetanus, diphtheria and acellular pertussis vaccines: 2005–2007*, 31 Vaccine 1447 (2013), filed as "Pet. Ex. 51."

[30] Yuelian Sun et al., *Risk of Febrile Seizures and Epilepsy After Vaccination With Diphtheria, Tetanus, Acellular Pertussis, Inactivated Poliovirus, and* Haemophilus Influenzae *Type b*, 307 JAMA 823 (2012), filed as "Pet. Ex. 52."

includes strong expression of proinflammatory cytokines, the activation of complement, and cellular recruitment. Pet. Ex. 50 at 3-4; Pet. Ex. 53.[31] He referenced *Vezzani* to show that these inflammatory mediators have been detected in epilepsy brain specimens, have been associated with the promotion of local inflammation, and are thought to function as "'neuromodulators'" directly affecting neuronal function and excitability leading to seizures. Pet. Ex. 50 at 4; Pet. Ex. 55.[32] He relied on *Baldelli* to show that in some predisposed people, an excessive innate immune response to a vaccine may lead to a "cytokine storm", which in turn can lead to brain inflammation then dysfunction. Pet. Ex. 50 at 4; Pet. Ex. 54.[33] Further, he relied on *van Vliet* to show that during focal inflammation, there is a disruption of the blood brain barrier, resulting in exposure of the brain to these mediators and thereby increasing the risk of seizures and epilepsy progression. Pet. Ex. 50 at 4; Pet. Ex. 56.[34] Dr. Khan then provided a list of articles—including *Gershman*, *Fan*, *Casey*, *Bitnun*, *Rogalewski*, *Kaplanski*, *Pirmohamed*, *Sriram*, and *Gamboa*—to show that his hypothesis is supported by other vaccinations that can cause encephalitis, including vaccines for yellow fever, COVID 19, smallpox, measles, hep A, hep B, poliovirus, pertussis (whole cell), and rabies. Pet. Ex. 50 at 4-5; Pet. Ex. 57;[35] Pet. Ex. 58;[36] Pet. Ex. 59;[37] Pet. Ex. 60;[38] Pet. Ex. 61;[39] Pet. Ex. 62;[40] Pet. Ex. 63;[41] Pet. Ex. 64;[42] Pet. Ex. 65.[43]

Dr. Khan concluded that based on the foregoing and his clinical judgment, petitioner suffered a "transient syndrome of encephalitis following the Tdap vaccination and that this temporal association is based on causation." Pet. Ex. 50 at 3. Further, "[t]he encephalitis manifest (sic) in activation and revving up the disease processes of her epilepsy resulting in a generalized seizure while driving. The close proximity of the events to the vaccination and the objective findings on brain imaging (with broad involvement of multiple lobes) and cerebrospinal fluid

---

[31] Caroline Hervé et al., *The how's and what's of vaccine reactogenicity*, 4 npj Vaccines (2019), https://doi.org/10.1038/s41541-019-0132-6, filed as "Pet. Ex. 53."

[32] Annamaria Vezzani et al., *IL-1 receptor/Toll-like receptor signaling in infection, inflammation, stress and neurodegeneration couples hyperexcitability and seizures*, 25 Brain, Behavior, and Immunity 1281 (2011), filed as "Pet. Ex. 55."

[33] Luca Baldelli et al., *Hyperacute reversible encephalopathy related to cytokine storm following COVID-19 vaccine*, 358 J. Neuroimmunology 577661 (2021), filed as "Pet. Ex. 54."

[34] E. A. van Vliet et al., *Blood–brain barrier leakage may lead to progression of temporal lobe epilepsy*, 130 Brain 521 (2007), filed as "Pet. Ex. 56."

[35] Bruno Fukelmann Guedes et al., *Potential autoimmune encephalitis following yellow fever vaccination: A report of three cases*, 355 J. Neuroimmunology 577548 (2021), filed as "Pet. Ex. 57."

[36] H.-T. Fan et al., *COVID-19 vaccine-induced encephalitis and status epilepticus*, QJM: Int'l J. of Med. (2022), https://doi.org/10.1093/qjmed/hcab335, filed as "Pet. Ex. 58."

[37] Christine Casey et al., *Surveillance Guidelines for Smallpox Vaccine (vaccinia) Adverse Reactions*, 55 MMWR 1 (2006), filed as "Pet. Ex. 59."

[38] Cristina Costales et al., *Vaccine-Associated Measles Encephalitis in Immunocompromised Child, California, USA*, 28 Emerging Infectious Diseases 906 (2022), filed as "Pet. Ex. 60."

[39] Andreas Rogalewski et al., *Improvement of advanced postvaccinal demyelinating encephalitis due to plasmapheresis*, 3 Neuropsychiatric Disease and Treatment 987 (2007), filed as "Pet. Ex. 61."

[40] Shaw FE et al., *Central nervous system demyelination after vaccination against hepatitis B and HLA haplotype*, 58 J. Neurology, Neurosurgery, and Psychiatry 758 (1995), filed as "Pet. Ex. 62."

[41] Munir Pirmohamed & Peter Winstanley, *Hepatitis B vaccine and neurotoxicity*, 73 Postgrad Med. J. 462 (1997), filed as "Pet. Ex. 63."

[42] S. Sriram, M.D. & L. Steinman, M.D., *Postinfectious and Postvaccinial Encephalomyelitis*, 2 Neurologic Clinics 341 (1984), filed as "Pet. Ex. 64."

[43] E. T. Gamboa, MD et al., *Delayed Onset of Post-Rabies Vaccination Encephalitis*, 13 Annals of Neurology 676 (1983), filed as "Pet. Ex. 65."

19

analysis corroborate this medical postulation. No other explanation was determined, and no other etiologies could be accounted for this observation." *Id*.

Dr. Khan then responded to what he expected would be the counterarguments to his opinion—that temporal relationship does not equate to causation that "the seizure was a result of a non-specific activation of latent epilepsy", and that the test results and findings on imaging were due to an unknown acute encephalitis—writing, "this type of clinical phenomenon . . . is clinically considered to be extremely unlikely." Pet. Ex. 50 at 5.

Dr. Khan did not address petitioner's cortical dysplasia. *See generally* Pet. Ex. 50.

## D. Respondent's Expert, Dr. Evans

Dr. Steven Evans[44] opined that petitioner has focal epilepsy due to cortical dysplasia unrelated to the Tdap vaccination. Resp. Ex. A at 10; Resp. Ex. C at 1, 5. He detailed petitioner's medical history which included a febrile convulsion at age 2, the concern in October of 2015 for sleep apnea and chronic myoclonus, affirmed experiences of déjà vu episodes since 2013 associated with stress and feelings of dread, a seizure and car accident on December 8, 2015, her medical course thereafter, and the diagnosis of cortical dysplasia. Resp. Ex. A at 1-6; Resp. Ex. D at 1, 2. Dr. Evans included that febrile seizures are a risk factor for later development of temporal lobe epilepsy. Resp. Ex. D at 3; Resp. Ex. D Tab 1;[45] Resp. Ex. D Tab 2;[46] Resp. Ex. D Tab 3.[47]

Dr. Evans explained that the April 2, 2018 MRI performed years after seizure onset and well after any acute MRI changes caused by the December 8, 2015 seizure should have resolved, used seizure protocol designed to show subtle lesions in the temporal lobe. It was interpreted as most likely showing cortical dysplasia and less likely low-grade glioma, both of which are common causes of temporal lobe epilepsy. Resp. Ex. C at 3.

Dr. Evans described petitioner's déjà vu episodes as focal seizures, explaining that déjà vu is a common seizure symptom in temporal lobe epilepsy. Resp. Ex. A at 6; Resp. Ex. C at 2; Resp. Ex. D at 3. Complex partial seizures are associated with amnesia in temporal lobe epilepsy, and unresponsive staring is a common symptom of complex partial seizures. Resp. Ex. A at 7; Resp. Ex. D at 3. He opined that the seizure petitioner had at the hospital after the car accident was likely a complex partial seizure because she seemed to retain capacity for semi-purposeful behavior and had amnesia after. Resp. Ex. A at 7. Dr. Evans further noted that it is not unusual for patients to have subtle focal seizures for some time before suffering from a generalized or complex partial seizure and then seeking care. *Id*. at 9; Resp. Ex. C at 1.

---

[44] Dr. Evans is a practicing general neurologist with subspecialty in the diagnosis and treatment of epilepsy. Resp. Ex. A at 1. He is board-certified in neurology and in clinical neurophysiology and epilepsy. He served as the Director of the Epilepsy Division at University of Louisville Hospital, where he is currently a full professor in the neurology department. *Id*.; Resp. Ex. B.

[45] Michael Duchowny, *Febrile Seizures*, *in* The Treatment of Epilepsy: Principles and Practice (Elaine Wyllie ed., 2001), filed as "Resp. Ex. D Tab 1."

[46] Katelin P. Patterson et al., *Origins of Temporal Lobe Epilepsy: Febrile Seizures and Febrile Status Epilepticus*, 11 Neurotherapeutics 242 (2014), filed as "Resp. Ex. D Tab 2."

[47] Aakriti Tiwari et al., *Febrile Seizures in Children: A Review*, 14 Cureus e31509 (2022), filed as "Resp. Ex. D Tab 3."

Dr. Evans defined epilepsy as any condition that causes recurrent unprovoked seizures and is often caused by lesions on the brain, such as cortical dysplasia. Resp. Ex. A at 7. Cerebral cortical dysplasia is a brain developmental abnormality present at birth and is a common cause of epilepsy later in life. *Id*.; Resp. Ex. A Tab 16.[48] Petitioner's epilepsy was due to cortical dysplasia with onset at least a year prior to vaccination evidenced by her déjà vu episodes. Resp. Ex. A at 7, 10; Resp. Ex. C at 1-2, 5; Resp. Ex. D at 3, 5.

Dr. Evans agreed with the radiological interpretation of petitioner's first MRI that "the evidence is strongly in favor" of the abnormalities/edema being caused by the seizure, which is consistent with the later MRIs that showed improvement then resolution without any treatment and without further symptoms. Resp. Ex. A at 8; Resp. Ex. C at 4-5; Resp. Ex. D at 3, 4, 7. He referred to *Kim*, which showed that the MRI appearance of limbic encephalitis and edema from recent seizures look very similar. Resp. Ex. D at 7; Resp. Ex. C Tab 2;[49] Pet. Ex. 61.[50] He noted Dr. Ramsay's opinion that petitioner had temporal lobe edema and a "provoked seizure due to DPT injection," asserting that petitioner has epilepsy, not a provoked seizure, otherwise she would not have had continued simple partial seizures, and Dr. Ramsay would not have had to continue treating, testing, and medicating petitioner. Resp. Ex. A at 8, 10; Resp. Ex. C at 1, 5; Resp. Ex. D at 2.

Further, Dr. Evans disagreed that petitioner had encephalitis, pointing out that all testing was negative. He acknowledged that encephalitis can cause seizures, but encephalitis when present also causes fever, cognitive dysfunction or coma, severe headache, and sometimes focal neurological deficits, none of which petitioner presented with or complained of. Resp. Ex. A at 8; Resp. Ex. C at 4-5; Resp. Ex. D at 5-6; Pet. Ex. 57;[51] Pet. Ex. 58.[52] Further, Dr. Nahm suggested that petitioner had NMDA receptor antibody-mediated encephalitis, which presents with psychiatric abnormality, encephalopathy, and recurrent seizures. Resp. Ex. A at 8-9. Petitioner did not have any of those symptoms, testing was negative with no support for a diagnosis of NMDA receptor antibody-mediated encephalitis. *Id*. at 9. Petitioner's symptoms on December 8 were not concerning for encephalitis, which is why she was discharged from the hospital. Resp. Ex. D at 6.

Dr. Evans explained that temporal lobe abnormalities like the ones seen on the first MRI and new-onset seizures can suggest encephalitis, which is why the lumbar puncture was performed to rule it out. Resp. Ex. A at 8; Resp. Ex. D at 6-7. The CSF in encephalitis shows signs of inflammation including elevated white blood cell count, elevated protein, and sometimes elevated red blood cell count. Resp. Ex. D at 6; Pet. Ex. 57;[53] Pet. Ex. 58;[54] Pet. Ex. 61;[55] Pet. Ex. 65.[56] Petitioner's lumbar puncture results were normal with normal white and red blood cell count,

---

[48] Siegel et al., *supra* note 7.
[49] Si Eun Kim et al., *Characteristics of seizure-induced signal changes on MRI in patients with first seizures*, 48 Seizure 62 (2017), filed as "Resp. Ex. C Tab 2."
[50] Rogalewski et al., *supra* note 39.
[51] Guedes et al., *supra* note 35.
[52] Fan et al., *supra* note 36.
[53] Guedes et al., *supra* note 35.
[54] Fan et al., *supra* note 36.
[55] Rogalewski et al., *supra* note 39.
[56] Gamboa et al., *supra* note 43.

which "strongly mitigates against encephalitis." Resp. Ex. A at 8. Dr. Evans added that "it is well known that CSF protein goes up with age" and petitioner's protein was only mildly elevated at 45. *Id*. at 9; Resp. Ex. D at 6. Citing *Breiner,* Dr. Evans explained that he was taught to allow 1 mg/dl per year of age, which for petitioner at the time of vaccination would have meant a normal protein level was 63; her protein level was 45. *Id*.; Resp. Ex. A Tab 5.[57] Petitioner's treating physicians "obviously did not consider her LP results or her symptoms to be concerning for encephalitis" because they discharged her home. Resp. Ex. D at 6. The only evidence suggesting encephalitis was the abnormal MRI on December 24, which is better explained by cortical dysplasia and residuals from the seizures. Resp. Ex. A at 9.

Dr. Evans "strongly disagree[d]" with Dr. Eady's and Dr. Khan's opinions that the Tdap vaccination caused encephalitis which exacerbated her epilepsy. He was confused by Dr. Eady's opinion and whether she believed the vaccination caused only the December 8, 2015 seizure or contributed in some larger way to petitioner's epilepsy. Regardless, there was no evidence that petitioner had brain inflammation and no evidence that the vaccination played any role in her seizures. He noted that Dr. Eady and Dr. Khan agreed that petitioner was having focal seizures prior to the Tdap vaccination, and focal seizures indicate the presence of epilepsy; thus, petitioner's epilepsy began prior to her receipt of the vaccine. Resp. Ex. D at 4-5. Further, "generalized seizures usually do eventually occur in patients with focal epilepsy." *Id*. at 5. Thus, the December 8, 2015 seizure was due to petitioner's pre-existing epilepsy—not the vaccination. *Id*. at 5, 6.

Moreover, studies have failed to show any association between vaccination and poor neurological outcomes. Resp. Ex. A at 9; Resp. Ex. A Tab 6.[58] Dr. Evans acknowledged that the package insert for the Tdap vaccine lists encephalopathy within 7 days of administration of a previous dose of a pertussis-antigen vaccine not attributable to another cause as a contraindication of future pertussis-antigen vaccines. Resp. Ex. A at 9; Resp. Ex. A Tab 2.[59] However, acellular pertussis vaccines are now standard in the U.S. and other developed countries. The rates of adverse events with acellular pertussis were reduced by 2/3 once the switch was made from whole cell pertussis vaccines. Resp. Ex. A at 9; Resp. Ex. A Tab 8;[60] Resp. Ex. A Tab 15.[61]

As a clinician, Dr. Evans recommends that his patients receive all recommended vaccines. He also recommends an antipyretic if they develop a fever after getting a vaccine, which is very common, because fever may lower seizure threshold. Resp. Ex. A at 9-10. Nevertheless, there is no evidence that a post-vaccination fever is any more likely to produce seizures than a fever for any other reason. *Id*. at 10. *Haberg*, *Barlow*, and *Vestergaard* all support that vaccination or febrile

---

[57] Ari Breiner et al., *Adult CSF total protein upper reference limits should be age-partitioned and significantly higher than 0.45 g/L: a systematic review*, 266 J. Neurology 616 (2019), filed as "Resp. Ex. A Tab 5."

[58] Natasha J. Brown et al., *Vaccination, seizures and 'vaccine damage'*, 20 Current Opinion in Neurology 181 (2007), filed as "Resp. Ex. A Tab 6."

[59] BOOSTRIX Prescribing Information, (2019), filed as "Resp. Ex. A Tab 2."

[60] Centers for Disease Control, *Surveillance Summaries*, 52 MMWR SS-1 (2003), filed as "Resp. Ex. A Tab 8."

[61] Steven Rosenthal et al., *The Safety of Acellular Pertussis Vaccine vs Whole-Cell Pertussis Vaccine*, 150 Archives of Pediatric & Adolescent Med. 457 (1996), filed as "Resp. Ex. A Tab 15."

seizures after vaccination are not associated with an increased risk of epilepsy. Resp. Ex. A at 10; Resp. Ex. A Tab 3;[62] Resp. Ex. A Tab 12;[63] Resp. Ex. A Tab 17.[64]

Summarily, Dr. Evans opined that petitioner had focal epilepsy before she received the subject Tdap vaccine on December 5, 2015, then had her first generalized seizure due to her epilepsy three days post-vaccination, her epilepsy was caused by cortical dysplasia not the Tdap vaccination, and petitioner never had encephalitis. Resp. Ex. D at 7.

### V.    The Parties' Arguments

#### A.  Petitioner's Motion for Ruling on the Record

Petitioner argued that she is entitled to compensation for the Table injury of encephalitis caused by the Tdap vaccine she received on December 5, 2015. Motion at 1. She detailed the Table criteria for encephalitis, submitting that she had neurologic dysfunction in the form of generalized seizures, confusion, and memory loss on December 8, 2015 and the elevated protein in the CSF was evidence of an inflammatory process in the brain. *Id*. at 9-10. Additionally, the MRI findings of edema and abnormal EEG findings were consistent with encephalitis. *Id*. at 10-11. The onset of her encephalitis was within 72 hours after receiving the Tdap vaccine, and the sequelae of her encephalitis lasted beyond six months. *Id*. at 11-13. Finally, petitioner submitted that she met none of the exclusionary criteria for a Table encephalitis. *Id*. at 13.

Petitioner claimed that the encephalitis caused by the Tdap vaccine activated her temporal lobe epilepsy. Motion at 13. She acknowledged the diagnosis of cortical dysplasia but argued that not all cortical dysplasia malformations are epileptic. *Id*. She relied on *Najm*, which was not filed as an exhibit in this case but attached for the first time to petitioner's Motion, to show that some patients with cortical dysplasia do not develop epilepsy until later in life, and when they do it is after a trigger like trauma, infection, stress, or sleep deprivation. *Id*. at 14, 18-29. Petitioner referenced *Kasper* and *Fauser*, also not filed during the pendency of this case but attached to her Motion, to show that there is evidence that the onset of epilepsy can occur at any point over the span of decades in patients with cortical dysplasia. *Id*. at 14, 30-46.

Petitioner further argued that *Vezzani* shows that "pro-epileptic injuries" activate inflammatory pathways that can cause recurrent seizures and that experiments show that CNS inflammation can change brain excitability and increase the likelihood of future seizures. Motion at 14; Pet. Ex. 55.[65] Together, this supports that "inflammatory processes are induced in the brain following infection, … febrile seizures, status epilepticus, which are all events associated with the occurrence of symptomatic seizures with an increased risk of developing epilepsy." Motion at 14-15; Pet. Ex. 55.

---

[62] William E. Barlow et al., *The Risk of Seizures After Receipt of Whole-Cell Pertussis or Measles, Mumps, Rubella Vaccine*, 345 New Eng. J Med. 656 (2001), filed as "Resp. Ex. A Tab 3."

[63] Siri E. Haberg et al., *Epilepsy in Children After Pandemic Influenza Vaccination*, 141 Pediatrics e20170752 (2018), filed as "Resp. Ex. A Tab 12."

[64] Mogens Vestergaard et al., *MMR Vaccination and Febrile Seizures: Evaluation of Susceptible Subgroups and Long-term Prognosis*, 292 JAMA 351 (2004), filed as "Resp. Ex. A Tab 17."

[65] Vezzani et al., *supra* note 32.

Petitioner submitted that in Dr. Eady's opinion, the etiology of petitioner's seizures was the brain inflammation caused by the Tdap vaccination and that petitioner has cortical dysplasia. Motion at 15.

Finally, petitioner noted that three other cases in the Vaccine Program involved an underlying cortical dysplasia. In *Heilig v. Sec'y of Health & Human Servs.*, Dr. Kinsbourne theorized that the DTaP vaccine was a "second hit" that triggered epilepsy in a child with a "very small abnormality" in the frontal lobe and that second hit "was needed before [the child's] first seizure occurred." The special master found that preponderant evidence supported the DTaP vaccine caused the child to develop epilepsy. No. 16-140V, 2024 WL 929030 (Fed. Cl. Spec. Mstr. Feb. 7, 2024); Motion at 15. In *Reilly v. Sec'y of Health and Human Servs.*, the special master determined that the pertussis component of the DTaP vaccine acted as a "second hit", causing the onset of infantile spasms in the context of a focal cortical dysplasia. No. 09-489V, 2016 WL 3456844, at *13-15 (Fed. Cl. Spec. Mstr., May 31, 2016); Motion at 15-16. However, in *Akers v. Sec'y of Health and Human Servs.*, the special master did not find the theory—cytokines produced in response to vaccination crossed the blood-brain-barrier and overactivated the already susceptible cortical dysplasia—to be persuasive. No. 15-597V, 2021 WL 3560069 (Fed. Cl. Spec. Mstr. July 6, 2021); Motion at 16.

Petitioner concluded that when "[a]pplying the 'second hit' theory to the facts of the instant case, there is preponderant evidence to establish that the [Tdap] vaccination served as the 'second hit' causing Petitioner to develop focal epilepsy." Motion at 16. She acknowledged staring spells that predated the vaccination but stated that her first grand mal seizure only occurred after the vaccine; but for the vaccine, petitioner would not have developed focal epilepsy. *Id*.

Petitioner's Motion for Ruling on the Record was the first time she mentioned a two-hit theory, which was not addressed by any of her treating doctors or experts.

## B. Respondent's Response

Respondent argued that petitioner failed to satisfy the Table requirements for an encephalitis following Tdap vaccination. Further, petitioner failed to meet any of the three *Althen* prongs required to prove causation-in-fact. Response at 1-2. Rather, petitioner's epilepsy predated and was thus unrelated to the Tdap vaccine she received on December 5, 2015. *Id*. at 4.

Respondent argued that petitioner's evidence does not support a diagnosis of encephalitis and that petitioner "appears to maintain a related causation-in-fact claim", alleging that a Table encephalitis activated her temporal lobe epilepsy. However, petitioner failed to prove any off-Table injury. Response at 12-13.

Regarding the Table encephalitis, petitioner's symptoms, including déjà vu episodes and myoclonic jerking during sleep, began at least two years prior to vaccination. Response at 18, 20. Petitioner had no central nervous system findings, and no inflammatory process was seen on CSF testing. *Id*. at 18-19. Other than the abnormal MRI finding, no evidence was consistent with encephalitis. *Id*. at 19. Dr. Evans agreed with the interpretation of the radiologist reading

petitioner's MRI films that the initial MRI findings can be better explained as resulting from cortical dysplasia and seizure activity than encephalitis. *Id*. at 19-21; Resp. Ex. A Tab 16.[66]

Further, petitioner failed to provide a sound and reliable theory to satisfy *Althen* Prong 1, instead simply submitting that petitioner suffered an encephalitis from the Tdap vaccination, which caused her epilepsy. Response at 22. Dr. Evans acknowledged the increased risk of seizure with fever. *Id*. Petitioner did not allege nor would the records support that she suffered any fever between December 5 and December 8, 2015. Regardless, febrile seizures are not associated with increased risk of epilepsy. *Id*. at 23; Resp. Ex. A Tab 3;[67] Resp. Ex. A Tab 17.[68] Petitioner's experts also failed to provide any opinion connecting the genetic bases of epilepsy and the role of environmental triggers. Response at 24.

Respondent acknowledged that the opinions of treating physicians are generally afforded weight. Response at 25-27. However, while Drs. Eady and Khan treated petitioner at some point post-vaccination, neither treated her during her initial presentation and both relied on the presence of encephalitis to explain petitioner's seizure disorder. However, petitioner was not diagnosed with or treated for encephalitis. *Id*. at 26-27.

Respondent concluded that petitioner suffered from focal epilepsy due to cortical dysplasia prior to her receipt of the Tdap vaccine and suffered a generalized seizure coincidently three days after the vaccination. Response at 21, 27-28. Although encephalitis was considered, it was investigated and ruled out by testing. *Id*. at 21. There is no scientific evidence that supports Tdap vaccine causing focal epilepsy in the context of cortical dysplasia. *Id*. at 24; *Akers*, No. 15-597V, 2021 WL 3560069, at \*39 ("FCD [focal cortical dysplasia] is highly correlated with epilepsy without need for a trigger").

## VI.    Legal Standards

### A.  Table Injury

The Vaccine Act provides two avenues for petitioners to receive compensation. First, a petitioner may demonstrate a "Table" injury—i.e., an injury listed on the Vaccine Injury Table that occurred within the provided time period. § 11(c)(1)(C)(i). "In such a case, causation is presumed." *Capizzano v. Sec'y of Health & Human Servs.*, 440 F.3d 1317, 1320 (Fed. Cir. 2006); *see* § 13(a)(1)(B).

A vaccine recipient shall be considered to have suffered an on-Table encephalitis if any injury meeting the description below of acute encephalitis occurs within 72 hours following vaccination and results in a chronic encephalopathy,

> (i)    Acute encephalitis. Encephalitis is indicated by evidence of neurologic dysfunction, as described in paragraph (c)(3)(i)(A) of this section, plus evidence of

---

[66] Siegel et al., *supra* note 7.
[67] Barlow et al., *supra* note 62.
[68] Vestergaard et al., *supra* note 64.

25

an inflammatory process in the brain, as described in paragraph (c)(3)(i)(B) of this section.

(A) Evidence of neurologic dysfunction consists of either:

(1) One of the following neurologic findings referable to the CNS: Focal cortical signs (such as aphasia, alexia, agraphia, cortical blindness); cranial nerve abnormalities; visual field defects; abnormal presence of primitive reflexes (such as Babinski's sign or sucking reflex); or cerebellar dysfunction (such as ataxia, dysmetria, or nystagmus); or

(2) An acute encephalopathy as set forth in paragraph §100.3(c)(2)(i) of this section.

(B) Evidence of an inflammatory process in the brain (central nervous system or CNS inflammation) must include cerebrospinal fluid (CSF) pleocytosis (>5 white blood cells (WBC)/mm in children > 2 months of age and adults; > 15 WBC/mm in children <2 months of age); or at least two of the following:

(1) Fever (temperature > 100.4 degrees Fahrenheit);

(2) Electroencephalogram findings consistent with encephalitis such as diffuse or multifocal nonspecific background slowing and periodic discharges; or

(3) Neuroimaging findings consistent with encephalitis, which include, but are not limited to brain/spine magnetic resonance imaging (MRI) displaying diffuse or multifocal areas of hyperintense signal on T2-weighted, diffusion-weighted image, or fluid-attenuation inversion recovery sequences.

42 C.F.R. §100.3(c)(3).

The exclusionary criteria for encephalitis include an underlying malignancy that led to a paraneoplastic encephalitis; an infectious disease associated with encephalitis; acute disseminated encephalomyelitis ("ADEM"); or other conditions or abnormalities that would explain the vaccine recipient's symptoms. 42 C.F.R. §100.3(c)(3)(ii).

## B.  Off-Table Injury

The second avenue for petitioners to receive compensation, where the alleged injury is not listed on the Vaccine Injury Table, is an "off-Table" injury, which requires that the petitioner "prove by a preponderance of the evidence that the vaccine at issue caused the injury." *Capizzano*, 440 F.3d at 1320; *see* § 11(c)(1)(C)(ii). Initially, a petitioner must provide evidence that he or she suffered, or continues to suffer, from a definitive injury. *Broekelschen v. Sec'y of Health & Human Servs*., 618 F.3d 1339, 1346 (Fed. Cir. 2010); *Lombardi v. Sec'y of Health & Human Servs*., 656 F.3d 1343, 1353 (Fed. Cir. 2011). A petitioner need not show that the vaccination was the sole cause, or even the predominant cause, of the alleged injury; showing that the vaccination was a

"substantial factor" and a "but for" cause of the injury is sufficient for recovery. *See Pafford v. Sec'y of Health & Human Servs.*, 451 F.3d 1352, 1355 (Fed. Cir. 2006); *Shyface v. Sec'y of Health & Human Servs.*, 165 F.3d 1344, 1352 (Fed. Cir. 1999).

To prove causation for an "off-Table" injury, petitioners must satisfy the three-pronged test established in *Althen v. Sec'y of Health & Human Servs.*, 418 F.3d 1274 (Fed. Cir. 2005). *Althen* requires that petitioners show by preponderant evidence that a vaccination caused his or her injury "by providing: (1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of a proximate temporal relationship between vaccination and injury." *Id*. at 1278. Together, these prongs must show "that the vaccine was 'not only a but-for cause of the injury but also a substantial factor in bringing about the injury.'" *Stone v. Sec'y of Health & Human Servs.*, 676 F.3d 1373, 1379 (Fed. Cir. 2012) (quoting *Shyface*, 165 F.3d at 1352-53).

Each of the *Althen* prongs requires a different showing. The first *Althen* prong requires petitioner to provide a "reputable medical theory" demonstrating that the vaccines received *can* cause the type of injury alleged. *Pafford*, 451 F.3d at 1355-56 (citation omitted).

The second *Althen* prong requires proof of a "logical sequence of cause and effect." *Capizzano*, 440 F.3d at 1326 (quoting *Althen*, 418 F.3d at 1278). In other words, even if the vaccinations can cause the injury, petitioner must show "that it did so in [this] particular case." *Hodges v. Sec'y of Health & Human Servs.*, 9 F.3d 958, 962 n.4 (Fed. Cir. 1993) (citation omitted). "A reputable medical or scientific explanation must support this logical sequence of cause and effect," *id.* at 961 (citation omitted), and "treating physicians are likely to be in the best position to determine whether a logical sequence of cause and effect show[s] that the vaccination was the reason for the injury," *Paluck v. Sec'y of Health & Human Servs.*, 786 F.3d 1373, 1385 (Fed. Cir. 2015) (quoting *Andreu*, 569 F.3d at 1375).

To satisfy the third *Althen* prong, petitioner must establish a "proximate temporal relationship" between the vaccination and the alleged injury. *Althen*, 418 F.3d at 1281. This "requires preponderant proof that the onset of symptoms occurred within a timeframe for which, given the medical understanding of the disorder's etiology, it is medically acceptable to infer causation-in-fact." *De Bazan v. Sec'y of Health & Human Servs.*, 539 F.3d 1347, 1352 (Fed. Cir. 2008).

A petitioner may also be eligible for compensation if the vaccinee had a preexisting condition that was significantly aggravated by a vaccine. *See* § 11(c)(1)(C). In considering a significant aggravation claim for an on-Table injury, the Federal Circuit placed the most significance on whether petitioner's symptoms began within the time period prescribed. *Whitecotton v. Sec'y of Health & Human Servs.*, 81 F.3d 1099, 1107 (Fed. Cir. 1996) ("Instead of asking whether the person's symptoms would have occurred absent the vaccine, our test hoves (sic) close to the statutory mandate, and relieves a petitioner of the burden of proving causation if she can show that the first symptom or manifestation of the significant aggravation of her condition occurred within the table time period provided in the statute.").

For a significant aggravation claim for an off-Table injury, the petitioner's burden is expanded to six elements, requiring petitioner to show, by preponderant evidence,

> (1) the person's condition prior to administration of the vaccine, (2) the person's current condition (or the condition following the vaccination if that is also pertinent), (3) whether the person's current condition constitutes a "significant aggravation" of the person's condition prior to vaccination, (4) a medical theory causally connecting such a significantly worsened condition to the vaccination, (5) a logical sequence of cause and effect showing that the vaccination was the reason for the significant aggravation, and (6) a showing of a proximate temporal relationship between the vaccination and the significant aggravation.

*Loving ex rel. Loving v. Sec'y of Health & Human Servs.*, 86 Fed. Cl. 135, 144 (2009). The fourth, fifth, and sixth factors are derived from the *Althen* prongs. *Id*. The Federal Circuit has agreed with this approach. *See W.C. v. Sec'y of Health & Human Servs.*, 704 F.3d 1352, 1357 (Fed. Cir. 2013) ("We hold that the *Loving* case provides the correct framework for evaluating off-table significant aggravation claims.")

### C. Fact Finding

The process for making determinations in Vaccine Program cases regarding factual issues begins with analyzing the medical records, which are required to be filed with the petition. § 11(c)(2). Medical records created contemporaneously with the events they describe are generally considered to be more trustworthy. *Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993); *but see Kirby v. Sec'y of Health & Human Servs.*, 993 F.3d 1378, 1382-83 (Fed. Cir. 2021) (clarifying that *Cucuras* does not stand for proposition that medical records are presumptively accurate and complete). While not presumed to be complete and accurate, medical records made while seeking treatment are generally afforded more weight than statements made by petitioner after-the-fact. *See Gerami v. Sec'y of Health & Human Servs.*, No. 12-442V, 2013 WL 5998109, at *4 (Fed. Cl. Spec. Mstr. Oct. 11, 2013) (finding that contemporaneously documented medical evidence was more persuasive than the letter prepared for litigation purposes), *mot. for rev. denied*, 127 Fed. Cl. 299 (2014). Indeed, "where later testimony conflicts with earlier contemporaneous documents, courts generally give the contemporaneous documentation more weight." *Campbell ex rel. Campbell v. Sec'y of Health & Human Servs.*, 69 Fed. Cl. 775, 779 (2006); *see United States v. U.S. Gypsum Co.*, 333 U.S. 364, 396 (1948).

Despite the weight afforded to medical records, special masters are not bound rigidly by those records in determining facts such as the onset of a petitioner's symptoms. *Vallenzuela v. Sec'y of Health & Human Servs.*, No. 90-1002V, 1991 WL 182241, at *3 (Fed. Cl. Spec. Mstr. Aug. 30, 1991); *see also Eng v. Sec'y of Health & Human Servs.*, No. 90-175V, 1994 WL 67704, at *3 (Fed. Cl. Spec. Mstr. Feb 18, 1994) (explaining that § 13(b)(2) "must be construed so as to give effect to § 13(b)(1) which directs the special master or court to consider the medical record...but does not require the special master or court to be bound by them"); *see also Burns v. Sec'y of Health & Human Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (holding that it is within the special master's discretion to determine whether to afford greater weight to medical records or to

other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is rational).

In short, "the record as a whole" must be considered. § 13(a).

### D.  Evaluating Expert Testimony

Establishing a sound and reliable medical theory connecting the vaccine to the injury often requires a petitioner to present expert testimony in support of his or her claim. *Lampe v. Sec'y of Health & Human Servs.*, 219 F.3d 1357, 1361 (Fed. Cir. 2000). The Supreme Court's opinion in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), requires that courts determine the reliability of an expert opinion before it may be considered as evidence. "In short, the requirement that an expert's testimony pertain to 'scientific knowledge' establishes a standard of evidentiary reliability." *Id*. at 590 (citation omitted). Thus, for Vaccine Act claims, a "special master is entitled to require some indicia of reliability to support the assertion of the expert witness." *Moberly ex rel. Moberly v. Sec'y of Health & Human Servs.*, 592 F.3d 1315, 1324 (Fed. Cir. 2010). The *Daubert* factors are used in the *weighing* of the reliability of scientific evidence proffered. *Davis v. Sec'y of Health & Human Servs.*, 94 Fed. Cl. 53, 66-67 (2010) ("uniquely in this Circuit, the *Daubert* factors have been employed also as an acceptable evidentiary-gauging tool with respect to persuasiveness of expert testimony already admitted"). Where both sides offer expert testimony, a special master's decision may be "based on the credibility of the experts and the relative persuasiveness of their competing theories." *Broekelschen*, 618 F.3d at 1347 (citing *Lampe*, 219 F.3d at 1362). And nothing requires the acceptance of an expert's conclusion "connected to existing data only by the *ipse dixit* of the expert," especially if "there is simply too great an analytical gap between the data and the opinion proffered." *Snyder ex rel. Snyder v. Sec'y of Health & Human Servs.*, 88 Fed. Cl. 706, 743 (2009) (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)).

### E.  Consideration of Medical Literature

Finally, although this decision discusses some but not all of the literature in detail, the undersigned reviewed and considered all of the medical records and literature submitted in this matter. *See Moriarty ex rel. Moriarty v. Sec'y of Health & Human Servs.*, 844 F.3d 1322, 1328 (Fed. Cir. 2016) ("We generally presume that a special master considered the relevant record evidence even though [s]he does not explicitly reference such evidence in h[er] decision."); *Simanski v. Sec'y of Health & Human Servs.*, 115 Fed. Cl. 407, 436 (2014) ("[A] Special Master is 'not required to discuss every piece of evidence or testimony in her decision.'" (citation omitted)), *aff'd*, 601 F. App'x 982 (Fed. Cir. 2015).

### VII.    Discussion

The petition alleges only a Table injury of chronic encephalitis resulting from a Tdap vaccine. *See* Petition. The preamble of petitioner's Motion for Ruling on the Record argues a Table injury of encephalitis. Motion at 1. However, the Motion concludes that the "Tdap vaccination caused encephalitis which activated [p]etitioner's temporal lobe epilepsy", suggesting that the Tdap vaccine caused a Table encephalitis, which in turn activated a pre-existing condition of

29

epilepsy. *Id.* at 13. At the time the Motion for Ruling on the Record was filed, the evidence showed that petitioner suffered from focal seizures prior to her receipt of the subject Tdap vaccine and that objective testing ruled out encephalitis as discussed repetitively during status conferences. The experts[69] agree that petitioner has temporal lobe epilepsy. Therefore, if petitioner fails to prove that she suffered an on-Table encephalitis following her receipt of the Tdap vaccine, she would then need to prove causation-in-fact under *Althen* and significant aggravation under *Loving* to be found entitled to compensation.

### A. Petitioner's Table Claim

Petitioner alleges she suffered a Table encephalitis within 72 hours of receiving the Tdap vaccine which resulted in chronic encephalopathy. To prove acute encephalitis, petitioner must demonstrate evidence of neurologic dysfunction and an inflammatory process in the brain. 42 C.F.R. §100.3(c)(3). The existence of any of the exclusionary criteria for encephalitis, which includes an underlying malignancy that led to a paraneoplastic encephalitis, an infectious disease associated with encephalitis, ADEM, or other conditions or abnormalities that would explain her symptoms, precludes a finding of an on-Table encephalitis. 42 C.F.R. §100.3(c)(3)(ii).

Petitioner argued that her generalized seizures, confusion, and memory loss are evidence of neurologic dysfunction sufficient to meet the criteria for an on-Table encephalitis. Motion at 9-11. Further, after the car accident and while in the ER, she had another seizure followed by a post-ictal state and was diagnosed with transient alteration of awareness and convulsions. *Id*. at 10. She argued that the elevated protein level on CSF testing, abnormal edema seen on MRI, and slowing on EEG constitute evidence of an inflammatory process in the brain. *Id*. at 10-11; Pet. Ex. 50 at 2-3.

Respondent argued that petitioner failed to meet the criteria for Table encephalitis. CSF testing was negative for infectious pathology with a normal white blood cell count, and there was no suggestion of any inflammatory process. Response at 18-19. Further, petitioner meets the exclusionary criteria for a Table encephalitis with MRI findings consistent with cortical dysplasia and better explained by her seizures. *Id*. at 19.

Dr. Khan and Dr. Eady opined that the Tdap vaccination triggered an inflammatory process causing encephalitis that "worsened her seizures." Pet. Ex. 32 at 1; Pet. Ex. 50 at 3. Dr. Khan opined that the timing post-vaccination, MRI results on December 24, 2015 showing edema with broad involvement of multiple lobes, and the elevated protein in the CSF were consistent with encephalitis. No other explanation for petitioner's condition was found. Pet. Ex. 50 at 2-3.

Dr. Evans disagreed that petitioner had encephalitis, arguing that petitioner had no clinical symptoms of encephalitis such as fever, headache, cognitive dysfunction, or psychiatric abnormalities. Resp. Ex. A at 8-9; Resp. Ex. C at 4-5; Resp. Ex. D at 5-6; Pet. Ex. 57;[70] Pet. Ex. 58.[71] The edema seen on the December 24 MRI was the result of petitioner's seizures on December

---

[69] This statement does not reflect Dr. Nahm's opinions, as petitioner expressly stated she would not rely on his opinions to support her Motion. ECF No. 80.

[70] Guedes et al., *supra* note 35.

[71] Fan et al., *supra* note 36.

8, not the cause. Resp. Ex. A at 8-9; Resp. Ex. C at 4-5; Resp. Ex. D at 3, 4, 7; Resp. Ex. C Tab 2;[72] Pet. Ex. 61.[73] The mildly increased protein on CSF testing was due to age and, more importantly, the CSF revealed normal white and red blood cell count which "strongly mitigates against encephalitis." Resp. Ex. A at 8, 9; Resp. Ex. D at 6; Resp. Ex. A Tab 5.[74] Thus, in addition to a lack of symptoms, there are no objective findings to support a diagnosis of encephalitis.

Dr. Khan and Dr. Eady were petitioner's treating physicians, but their involvement in her care was limited and came well after the events in December of 2015. As such, their opinions are not entitled to the same level of deference given to treating physicians who are familiar with petitioners both before and after their alleged vaccine injury. *Nuttall v. Sec'y of Health & Human Servs.*, 122 Fed. Cl. 821, 832 (2015) ("The reasoning underlying the finding that opinions of treating physicians should be given particular weight does not apply when, as here, the treating physician only saw the patient after the injury and based his opinion on the same evidence as relied upon by the retained experts."), *aff'd*, 640 F. App'x 996 (Fed. Cir. 2016). While their opinions are duly considered in light of both Drs. Khan and Eady having the benefit of evaluating and treating petitioner at some point in the course of her care, their opinions are not binding or beyond reproach. *See also* § 13(b)(1); *Snyder,* 88 Fed. Cl. at 746 n.67 ("there is nothing ... that mandates that the testimony of a treating physician is sacrosanct—that it must be accepted in its entirety and cannot be rebutted").

Dr. Khan saw petitioner once on May 9, 2016. He conducted the 48-hour EEG and reviewed the results. Pet. Ex. 50 at 1. Dr. Eady took over petitioner's neurological care in July of 2020, nearly five years after the subject vaccine. Pet. Ex. 32. Both based their opinions on the Tdap vaccine having caused an encephalitis, which was contrary to the opinions of the treating physicians who cared for petitioner in December of 2015, the contemporaneous medical records, and the objective testing. The December 24, 2015 MRI was interpreted by the radiologist as showing edema in the temporal lobes that "given [her] history", "may be related to seizure activity" but added that encephalitis could not be excluded and required clinical correlation with CSF analysis. Pet. Ex. 3 at 106-07; *see also* Pet. Ex. 29 at 60 (initial visit with Dr. Eady on July 16, 2020 with assessment including among other considerations "ictal sequela"). The EEG performed that day was "mildly abnormal [] with left temporal slowing . . . nonspecific and most often associated with vascular disease. No epileptiform potentials or electrographic seizures" were identified. Pet. Ex. 3 at 112-13. CSF analysis was done that same day and revealed "mildly" elevated protein at 45 with reference range of 15-40 mg/dL and a normal red cell count and normal white blood cell count of 1 with reference range of 0-5. *Id*. at 11, 15, 18, 122, 125. The discharging physician wrote that petitioner "appear[ed] remarkably well," and there was "low clinical suspicion for acute infectious etiology." She was discharged and told to follow up with neurology. *Id*. at 10, 121.

Dr. Elkayam, the treating neurologist at that time, advised petitioner that there was no herpes encephalitis, no infection, and no cancer cells in the CSF. Pet. Ex. 3 at 137, 140. Dr. Elkayam's record for petitioner's visit on January 6, 2016 included that her test results, specifically

---

[72] Kim et al., *supra* note 49.

[73] Rogalewski et al., *supra* note 39.

[74] Breiner et al., *supra* note 57.

CSF testing and other laboratory work, were negative/unremarkable and that the EEG was consistent with the MRI findings. *Id*. at 157. Dr. Elkayam's assessment was abnormal brain MRI, seizure disorder, and unspecified convulsions. *Id*. at 160, 167. There was no reference to the Tdap vaccination.

Repeat imaging on January 11, 2016 revealed near normal findings on MRI with prior edema signal in the temporal lobes almost resolved and mildly abnormal EEG with background frequencies a little slower than expected for an adult, clinically correlated with "mild nonfocal cortical dysfunction, which could be . . . late residual of a convulsion." Pet. Ex. 3 at 175, 185-86, 191-92. Paraneoplastic panel antibodies were also normal. *Id*. at 211-12.

Petitioner herself acknowledged the negative findings of encephalitis in an email to Dr. Short where she advised that encephalitis was ruled out by lumbar puncture which "tested for everything from cancer cells to Lyme, West Nile, herpes encephalitis, and even syphilis of the brain", and "[e]verything came back clear except for a slightly elevated protein level." Dr. Short's office responded, stating in part that it sounded like a viral meningitis not from the vaccine. Pet. Ex. 4 at 43. Petitioner's daughter also affirmed that they were told "there was no significant sign of encephalitis or otherwise" on the testing from December 24, 2015. Pet. Ex. 26 at 2.

Petitioner's later medical records repeat a past medical history of encephalopathy/encephalitis, despite the objective testing ruling it out. Pet. Ex. 3 at 211-12, 255 (Dr. Elkayam informing petitioner on January 18, 2016 that the paraneoplastic panel antibodies that tested for limbic encephalitis came back negative and labs were normal); Pet. Ex. 50 at 2 (Dr. Khan's interpretation of EEG results as focal epilepsy while also referencing the CSF and paraneoplastic panel that ruled out encephalitis). Other records include a history of encephalitis reported by petitioner. Pet. Ex. 6 at 64 (presentation to a new PCP on May 26, 2017 reporting a medical history of arthritis, lipoma, seizures and encephalitis due to HSV"); Pet. Ex. 43 at 84, 88-89, 91, 93-94 (hospital record from July 12, 2019 containing a history of seizures and encephalitis secondary to HSV). The perpetuation of a diagnosis in electronic records that has been ruled out is not persuasive evidence of a diagnosis of encephalitis in this case.

Petitioner did not present with or suffer from any of the clinical symptoms of encephalitis. She was not diagnosed with or treated for encephalitis, and encephalitis was ruled out by objective testing. Further, petitioner was suffering from focal seizures prior to her receipt of the Tdap vaccination and was ultimately diagnosed with cortical dysplasia, which is a recognized cause of epilepsy, thus excluding her claim from a Table encephalitis. 42 C.F.R. §100.3(c)(3)(ii). For these reasons, the evidence does not show that petitioner suffered a Table injury as alleged.

### B. Petitioner's Off-Table Claim

Having failed to provide preponderant evidence of a Table encephalitis, the analysis could end here. ECF No. 1. However, because petitioner's moving papers imply a causation-in-fact claim that the Tdap vaccination on December 5, 2015 caused or worsened her epilepsy, it will be addressed.

To satisfy *Althen* Prong 1 / *Loving* Prong 4, petitioner must provide a sound and reliable medical theory as to how the Tdap vaccine could cause or significantly aggravate symptoms. *Althen* Prong 2 / *Loving* Prong 5 requires proof of a logical sequence of cause and effect, usually supported by facts derived from a petitioner's medical records. *Althen*, 418 F.3d at 1278; *Capizzano*, 440 F.3d at 1326; *Grant v. Sec'y of Health & Human Servs.*, 956 F.2d 1144, 1148 (Fed. Cir. 1992). *Althen* Prong 3 / *Loving* Prong 6 requires a showing of a proximate temporal relationship between the vaccination and the significant aggravation. *Loving*, 86 Fed. Cl. at 144.

Petitioner's proposed theory is that the Tdap vaccine caused inflammation that resulted in encephalitis, seizures, and ultimately temporal lobe epilepsy. Pet. Ex. 32 at 1; Pet. Ex. 50 at 2, 3. In other words, the theory relies on the presence of encephalitis. *Broekelschen*, 618 F.3d at 1346; *Lombardi*, 656 F.3d at 1353. However, encephalitis was ruled out by objective testing. Pet. Ex. 3 at 157. Therefore, petitioner must provide a sound and reliable theory for how the Tdap vaccine caused or worsened her temporal lobe epilepsy within a medically reasonable time post-vaccine. The difficulty is that petitioner did not proffer such a theory that directly linked the subject vaccine to the development or progression of her epilepsy.

Dr. Khan opined that the Tdap vaccine triggered a "complex cascade of immunological activations", including the production of inflammatory mediators like cytokines that directly affect neuronal function and excitability, leading to seizures. Pet. Ex. 50 at 3-4; Pet. Ex. 53;[75] Pet. Ex. 54;[76] Pet. Ex. 55.[77] When there is brain inflammation, the blood-brain-barrier is disrupted and may allow inflammatory mediators to enter the brain, increasing the risk of seizures and disease progression of epilepsy. Pet. Ex. 50 at 4; Pet. Ex. 56.[78] Dr. Eady submitted that she bases petitioner's treatment on this explanation of her "disease course." Pet. Ex. 32 at 1. Dr. Ramsay's assessment was "DPT reaction" and "[p]rovoked seizure – the temporal relationship of the DPT shot and the seizure and the MRI changes suggest the seizure was from a reaction to the DPT," with follow up MRI showing resolution of changes. Pet. Ex. 3 at 263.

Dr. Khan provided *Herve* to show that vaccines result in the production of cytokines and inflammatory mediators. However, *Herve* does not discuss the ability of cytokines to cross the blood-brain barrier, cause damage, worsen seizures, or trigger epilepsy. Pet. Ex. 53.[79] Similarly, Dr. Khan relied on *Vezzani*, asserting that the study showed that cytokines contribute in some way to neuronal excitability of underlying seizures, but this discussion was in the context of "inflammatory processes [that] are induced in [the] brain following infection, neurotrauma, stroke, febrile seizures, [and] status epilepticus"; *Vezzani* does not discuss vaccination or explain how cytokines can contribute to or cause afebrile seizures or epilepsy. Pet. Ex. 55 at 2.[80] Furthermore, petitioner did not address whether the cytokines produced in response to vaccination, specifically Tdap vaccination, are the same as or different from those produced in response to other inflammatory challenges.

---

[75] Hervé et al., *supra* note 31.

[76] Baldelli et al., *supra* note 33.

[77] Vezzani et al., *supra* note 32.

[78] van Vliet et al., *supra* note 34.

[79] Hervé et al., *supra* note 31.

[80] Vezzani et al., *supra* note 32.

Dr. Khan relied on *Chang* as support for adverse reactions to Tdap vaccine, including seizures. *Chang* used VAERS, the U.S. passive surveillance system for adverse events, and included the many limitations of VAERS such as underreporting, incomplete information, inadequate data, and lack of an unbiased comparison group. The authors note that "[c]ausality between reported [adverse events] and vaccines cannot usually be assessed from individual reports to VAERS." Pet. Ex. 51 at 2, 5.[81] The authors further concluded that their surveillance summary was "reassuring" of the safety of Tdap in all age groups. *Id*. at 5. *Chang* also cited to the 2012 Institute of Medicine report on causality of vaccine adverse events, which concluded that "the evidence is inadequate to accept or reject a causal relationship" between Tdap and seizures, among others. *Id*. at 2.

Dr. Khan also relied on *Sun,* which found a small increased risk of "febrile" seizures on the day of the first two DTaP-IPV-Hib vaccinations at 3 and 5 months of age but no increased risk of epilepsy. *Sun* did not discuss afebrile seizures. Pet. Ex. 52 at 1.[82]

Respondent argued that the literature does not show an association between vaccination and poor neurological outcomes. Resp. Ex. A at 9; Resp. Ex. A Tab 6.[83] Dr. Evans acknowledged a concern for seizures post-vaccination resulting from fever which may lower seizure threshold. Resp. Ex. A at 9-10. But *Haberg*, *Barlow*, and *Vestergaard* all show that neither vaccinations nor febrile seizures after vaccinations are associated with an increased risk of epilepsy. *Id*. at 10; Resp. Ex. A Tab 3;[84] Resp. Ex. A Tab 12;[85] Resp. Ex. A Tab 17.[86]

Dr. Khan and Dr. Eady failed to provide any explanation beyond a conclusory theory that the Tdap vaccine can "rev[] up the disease process" of epilepsy via an inflammatory process that breached the blood brain barrier, causing encephalitis and temporal lobe epilepsy. Drs. Khan and Eady did not acknowledge or explain how this theory applies to this case in the context of pre-existing focal seizures, afebrile seizures, and cortical dysplasia, which a known cause of epilepsy. Furthermore, they did not explain how their theories involving an inflammatory process apply here where there are no clinical symptoms of fever, headache, or illness. Still further, petitioner's treater Dr. Ramsay concluded that petitioner suffered from a "DPT reaction", though petitioner received a Tdap vaccination, not a whole cell DPT vaccine. Additionally, Dr. Ramsay's medical records do not include petitioner's history of absence seizures prior to receipt of the Tdap vaccination, rendering his opinions questionable as to whether he was aware of the prior history of seizures before reaching his conclusion. In sum, petitioner provided no persuasive evidence that vaccinations can cause afebrile seizures or cause or aggravate epilepsy or that the Tdap vaccination did so in this case.

---

[81] Chang et al., *supra* note 29.

[82] Sun et al., *supra* note 30.

[83] Brown et al., supra note 58.

[84] Barlow et al., *supra* note 62. *Barlow* discussed febrile seizures following whole cell DTP and MMR vaccines, but neither vaccine was associated with an increased risk of afebrile seizures.

[85] Haberg et al., *supra* note 63.

[86] Vestergaard et al., *supra* note 64.

While cortical dysplasia was not discussed at all by Drs. Khan, Eady, or Ramsay, the literature filed by petitioner discusses it in the context of temporal lobe epilepsy. Pet. Ex. 21;[87] Pet. Ex. 22;[88] Pet. Ex. 24.[89] Cortical dysplasia is described as a malformation of cortical development and is the most common cause of epilepsy in children and second or third most common cause of epilepsy in adults. Pet. Ex. 21 at 1; Pet. Ex. 22 at 1. There are three classifications of cortical dysplasia, one of which presents with mild symptoms, has late onset in adulthood, and is associated with changes in the temporal lobe. Pet. Ex. 21 at 1. Unless the focal cortical dysplasia area is large, patients do not have severe neurological deficits, and the main clinical manifestation is epilepsy. Pet. Ex. 22 at 2. Déjà vu is frequently studied in the context of temporal lobe epilepsy and is described as a "nebulous mental experience—a mismatch between subjective perceptions of memory and retrieval itself." Pet. Ex. 24 at 1.

In her Motion, petitioner proposed for the first time a two-hit theory with cortical dysplasia as the "first hit" and the Tdap vaccine the "second hit." Motion at 16. She relied on two prior cases in which this theory was successful. However, those two cases are distinguishable from the instant case. The infant in *Heilig* had an underlying cortical dysplasia. She received DTaP, hep B, IPV, Hib, rotavirus, and PCV vaccines at her six-month well child visit, then had a 30-minute febrile, tonic-clinic seizure the following day. She also tested positive for RSV. The special master found the petitioner's theory—that the vaccines she received caused her to develop a fever, which in turn triggered a febrile seizure and lowered the seizure threshold and acted as the "second hit" of the child's cortical dysplasia, ultimately triggering epilepsy—to be persuasive. *Heilig*, No. 16-140V, 2024 WL 929030. In *Reilly*, the special master accepted the petitioner's theory that the pertussis component of the DTaP vaccine administered to an infant at his six-month well child visit acted as the "second hit" in triggering his epilepsy disorder, in the context of a lower seizure threshold due to underlying cortical dysplasia and fever present at the time of vaccination. *Reilly*, No. 09-489V, 2016 WL 3456844. In other words, both *Heilig* and *Reilly* involved infants who had a fever or febrile seizures. In this case, there is no evidence that petitioner had a fever or febrile seizure at any point after receiving the subject vaccine.

Furthermore, the two-hit theory has been found unpersuasive in other afebrile seizure cases, including in one before the undersigned. *Gram v. Sec'y of Health & Human Servs.*, No. 15-515V, 2022 WL 17687972 (rejecting a two-hit theory in the context of an afebrile seizure and epilepsy); *Akers*, No. 15-597V, 2021 WL 3560069.

Regardless, a two-hit theory was not sufficiently articulated in this case to satisfy petitioner's burden under *Althen* Prong 1 / *Loving* Prong 4. Further, this theory is at odds with her treaters'/experts' opinions who did not address the cortical dysplasia as contributory, despite several discussions at status conferences that this would be necessary. ECF Nos. 38, 40, 55, 71. In fact, Dr. Khan went so far as to deny that any other etiology was present that could account for petitioner's condition, essentially rejecting a purported "first hit." Pet. Ex. 50 at 3. While Dr. Evans

---

[87] Joanna Kabat & Przemystaw Krol, *Focal cortical dysplasia – review*, 77 Polish J. of Radiology 35 (2012), filed as "Pet. Ex. 21."

[88] Blumcke et al., *supra* note 6.

[89] Chris J.A. Moulin, *The strange sensation of déjà vu: not so strange in temporal lobe epilepsy*, 85 J. of Neurology, Neurosurgery, and Psychiatry 132 (2014), filed as "Pet. Ex. 24."

was not afforded an opportunity to address the late proposed two-hit theory, that is of no consequence. The two-hit theory was unsupported and was a rather last minute "Hail Mary."

In sum, petitioner failed to provide a sound and reliable theory for how the Tdap vaccine can cause or worsen afebrile seizures or temporal lobe epilepsy and therefore has failed to satisfy *Althen* Prong 1 / *Loving* Prong 4.

As to the remaining *Loving* Prongs, it is impossible to determine whether petitioner's seizures worsened from what they were prior to the Tdap vaccine. Seizures commonly associated with cortical dysplasia include complex partial seizures, generalized complex partial seizures, simple partial seizures, generalized tonic clonic seizures—some with auras, and nocturnal seizures. Resp. Ex. A Tab 16 at 1.[90] Throughout the evidence filed in this case, petitioner reported "déjà vu" episodes before and after receipt of the Tdap vaccine, a term of art commonly used to describe experiences of patients with temporal lobe epilepsy. Further, the evidence shows that petitioner experienced what appeared to be absence seizures years prior to the vaccine and nocturnal seizures months prior to the vaccine. Though petitioner did not receive the epilepsy diagnosis until post-vaccination, diagnosis is not the same thing as onset. *Rocha v. Sec'y of Health & Human Servs.*, No. 16-241V, 2024 WL 752787, at *33 (Fed. Cl. Spec. Mstr. Feb. 1, 2024) ("As a matter of logic, a doctor's detection of a disease does not establish the date the disease began."). The experts agreed that petitioner had déjà vu episodes before receiving the Tdap vaccine, but petitioner's experts who were her treaters after the fact largely ignored this history—including the episodes she reported that morning prior to and leading to her car accident—in rendering their opinions, instead opting to associate her seizures on December 8, 2015 with the Tdap vaccine based on temporal proximity. Pet. Ex. 3 at 92.

For the reasons set forth above, petitioner has failed to establish the remaining *Althen* and *Loving* Prongs. *See* § 300aa-33(4); *Loving*, 86 Fed. Cl. at 144 (2009); *see also W.C.*, 704 F.3d at 1357.

## VIII.    Conclusion

Upon careful evaluation of all evidence submitted in this matter, I find that petitioner has not provided preponderant evidence that the Tdap vaccine she received on December 5, 2015 played any role in her condition or alleged injury. Thus, she is not entitled to compensation. The Clerk's Office shall enter judgment accordingly.[91]

**IT IS SO ORDERED.**

**s/ Mindy Michaels Roth**
Mindy Michaels Roth
Special Master

---

[90] Siegel et al., *supra* note 7.
[91] Pursuant to Vaccine Rule 11(a), if a motion for review is not filed within 30 days after the filing of the special master's decision, the clerk will enter judgment immediately.